STATE OF CONNECTICUT *v.* MITCHELL
HENDERSON
(AC 15998)

O'Connell, C. J., and Lavery and Hennessy, Js.

---

Argued November 4, 1997—officially released January 27, 1998

*Craig A. Raabe*, special public defender, with whom, on the brief, was *James P. Ray*, special public defender, for the appellant (defendant).

*Harry Weller*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Carl E. Taylor*, assistant state's attorney, for the appellee (state).

*Opinion*

HENNESSY, J. The defendant, Mitchell Henderson, appeals from a judgment of conviction, rendered after a jury trial, of two counts of larceny in the sixth degree in violation of General Statutes § 53a-125b, one count of assault in the third degree in violation of General Statutes § 53a-61, two counts of credit card theft in violation of General Statutes § 53a-128c (a), one count of forgery in the second degree in violation of General Statutes § 53a-139 (a) (1), and one count of criminal attempt to commit kidnapping in the second degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-94 (a). The defendant claims that the trial court improperly denied his motions (1) to dismiss that alleged a denial of due process in the jury selection system, (2) for judgment of acquittal of forgery in the second degree by possession of a forged instrument, (3) for judgment of acquittal on the ground that the state failed to present sufficient evidence to prove that the items were "credit cards" within the statutory definition, (4) to dismiss for improper venue, (5) to dismiss for violation of a motion in limine, and (6) to dismiss for indoctrinating the jury

on charges that were dismissed midway through trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of March 16, 1993, several personal items were stolen from Deana Quilty's car while it was parked in Hartford. Among those items were two credit cards, an automated teller machine (ATM) card, and several other cards in her name. On March 17, 1993, the defendant presented a check and courtesy card to a cashier at a supermarket in Wethersfield. A store detective, Clinton Marth, observed the cashier leave her cash register to take the check and courtesy card to the manager. Marth called the manager to verify that the defendant had presented proper identification to the cashier. After speaking to the manager, Marth noticed that the defendant was no longer waiting at the cash register.

Marth left the security booth and saw the defendant running across the supermarket parking lot carrying grocery bags that he eventually dropped. Marth caught up to the defendant and identified himself as store security. When the defendant did not stop, Marth grabbed and turned the defendant toward him. The defendant brandished a small pocketknife and cut Marth's finger. After breaking away from Marth, the defendant jumped into a car waiting for a customer and ordered the operator to drive out of the parking lot. The defendant abandoned this endeavor after a few seconds when he saw that the parking lot exits were blocked by shopping carts.

The Wethersfield police department conducted a search of the area and found the defendant in a laundry room of the nearby Park Ridge Apartments and placed him under arrest. A search incident to the arrest produced a VISA card, a Discover card, an ATM card, store

courtesy cards, a library card and a video store card, all in the name of Deana Quilty (victim).

The jury returned a verdict of guilty of two counts of larceny in the sixth degree, one count of assault in the second degree, two counts of credit card theft, one count of forgery, and one count of attempted kidnapping. The trial court rendered judgment on the verdict, and this appeal followed.

I

The defendant's first claim is that he was denied due process because the state failed to maintain statistical information regarding the racial composition of the jury pool, thereby placing an unconstitutional burden on him to prove a prima facie case of the absence of a fair cross section of the population within the jury array. The crux of the defendant's constitutional claim is that because the state did not maintain statistics on the racial composition of the jury pool at the time of his trial, his sixth amendment right to a jury composed of a fair cross section of the population was violated. On that basis, the defendant argues that the trial court's denial of the motion to dismiss the charges against him was improper. We disagree.

Additional facts are necessary to the resolution of this claim. In March, 1993, the defendant was arrested. He did not file a motion for the disclosure of jury data in order to determine the racial composition of the jury pool until November 6, 1995, on the eve of trial. In a hearing on the motion, the trial court adopted, and the parties stipulated to, the findings of a case involving a jury challenge, *State* v. *Ortiz*, Superior Court, judicial district of Hartford-New Britain, geographical area number fourteen, Docket No. CR-14-448783 (*Corrigan, J.*). The stipulation established that the state did not maintain or collect demographic information that

would yield the racial composition of the jury pool in the judicial district of Hartford.

During the pretrial hearing, the defendant called Richard J. Gayer, the jury administrator for the state, and Ruth Kvisis, the Hartford Superior Court jury pool officer. Gayer confirmed that racial demographics of the jury pool were not maintained while Kvisis testified that she did not know the racial demographics of the citizens that report for jury duty in Hartford. The defendant then moved to dismiss the proceedings against him on the ground that the state's inability to produce information on the racial composition of the jury pool denied him due process of law. The defendant argued that the lack of information precluded him from establishing a prima facia pattern of underrepresentation of minorities in the judicial district of Hartford jury pools. The trial court denied the motion to dismiss.[1]

It is undisputed that, pursuant to article first, §§ 8, 9 and 19 of the constitution of Connecticut and the sixth and fourteenth amendments to the United States constitution, a criminal defendant has a right to a petit jury that is drawn from a pool that is "representative of a fair cross section of the community." *State* v. *Castonguay*, 194 Conn. 416, 420–21, 481 A.2d 56 (1984); see generally *Duren* v. *Missouri*, 439 U.S. 357, 363–64, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979). The United States Supreme Court has stated that the fair representation of the community is one that does not "systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor* v. *Louisiana*, 419 U.S. 522, 538, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975). Accordingly, a state may not systematically deny members of a certain race "the right

---

[1] Since the defendant's conviction, the legislature has enacted a statute that requires the jury administrator to include information on the jury questionnaire regarding a juror's race. General Statutes § 51-232 (c).

to participate as jurors in the administration of justice." *Alexander* v. *Louisiana*, 405 U.S. 625, 628–29, 92 S. Ct. 1221, 31 L. Ed. 2d 536 (1972).

To sustain an allegation of noncompliance with the "fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren* v *Missouri*, supra, 439 U.S. 364. The *Duren* criteria were adopted and applied by our Supreme Court in *State* v. *Castonguay*, supra, 194 Conn. 421–22. "Once a prima facia case of invidious discrimination is established, the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result. *Turner* v. *Fouche*, 396 U.S. 346, 361 [90 S. Ct. 532, 24 L. Ed. 2d 567] (1970); *Eubanks* v. *Louisiana*, 356 U.S. 584, 587 [78 S. Ct. 970, 2 L. Ed. 2d 991] (1958)." *Alexander* v. *Louisiana*, supra, 405 U.S. 631–32. Although precision is not demanded, "a factual inquiry is necessary in each case that takes into account all possible explanatory factors." Id., 630.

In *Taylor* v. *Louisiana*, supra, 419 U.S. 538, the Supreme Court stated that "[d]efendants are not entitled to a jury of any particular composition . . . but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." (Citations omitted.) It is clear that one does not have the absolute right to a petit jury that is representative of the community; this right only ensures that an identifiable segment

of the community will not be systematically excluded from the jury pool. *Apodaca* v. *Oregon*, 406 U.S. 404, 413, 92 S. Ct. 1628, 32 L. Ed. 2d 184 (1972).

To prove that the jury pool[2] is unconstitutional, the moving party must first make out a prima facie case of discrimination. The defendant's due process claim fails because while it is difficult to prove a prima facia case of discrimination absent the demographic information he asserts is the responsibility of the state to collect, it is not impossible. See *State* v. *Castonguay*, supra, 194 Conn. 416.

In *Castonguay*, the defendant successfully presented a prima facie case to the trial court showing a disparity between the number of Hispanic grand jurors who served and the percentage of the population. Id., 422. To that end, the defendant used voter registration lists to determine the percentage of Hispanic persons eligible to participate in the grand jury and then compared that to the actual percentage of Hispanics in the community. Here, the defendant has not established, and we find no indication, that similar efforts are incapable of repetition.

We also note that the relief requested by the defendant in this appeal, that he "be granted a new trial under the legislatively revised jury selection system," illustrates the faulty logic in this appeal. The fact that demographic information will now be available in a

---

[2] General Statutes (Rev. to 1993) § 51-217 (a) (1) provides in relevant part: "All jurors shall be electors, or citizens of the United States who are residents of this state and listed in the records of the motor vehicle department as persons to whom motor vehicle operators' licenses have been issued . . . ." Challenges to this system have been rejected. See *State* v. *Townsend*, 167 Conn. 539, 356 A.2d 125, cert. denied, 423 U.S. 846, 96 S. Ct. 84, 46 L. Ed. 2d 67 (1975) (requirement that jurors be electors and be chosen from voter registration lists does not discriminate on basis of race or color, notwithstanding unsubstantiated claim that black residents registered and voted in smaller proportions than white residents); see generally *State* v. *Brown*, 169 Conn. 692, 364 A.2d 186 (1975).

limited sense does not guarantee that the defendant's jury will be composed of a fair cross section of the community or that he was denied a fair cross section previously.

As noted earlier, the only evidence that was presented to the trial court to establish a violation of the defendant's constitutional right was the lack of statistical record keeping by the state. That, standing alone, does not satisfy the mandates of *Taylor* and *Castonguay*. The defendant's argument rests on the assumption that the only way to prove that the jury pool does not reflect a fair cross section of the community is with information provided to the defendant by the state. We disagree. While it is clear that this information would make it much easier to prove such a claim, we are not persuaded that the lack of statistical information deprived the defendant of his constitutional right to establish a fair cross section claim.

II

The defendant's second argument is that the state failed to prove the statutory elements required to find him guilty of forgery in the second degree in violation of § 53a-139.[3] In the defendant's brief, he states that he "is not contesting the evidence, or even the inferences, if any that might be drawn from that evidence. . . . The state only offered evidence that purported to show [the defendant] making a false statement." We agree

---

[3] General Statutes § 53a-139 provides in relevant part: "(a) A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed: (1) A deed, will, codicil, contract, assignment, commercial instrument or other instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status . . . ."

with the state that this claim is both legally and factually incorrect and reject it out of hand.

For the defendant to be found guilty of violating § 53a-139, the state must prove that (1) the defendant intended to deceive another and (2) that he possessed a written instrument that he knew to be forged. The defendant does not allege that the state failed to show that he intended to deceive another, rather he merely challenges the possession element. To prove that someone possessed an object, the state must show that he "knew of its presence and exercised dominion and control over it." (Internal quotation marks omitted.) *State* v. *Ogrinc*, 29 Conn. App. 694, 698, 617 A.2d 924 (1992).

The state offered into evidence a store security videotape from the day of the incident. The video shows the defendant writing a check and handing it to the cashier along with the courtesy card, both of which, other evidence showed, had been stolen from the victim. The check had the victim's name and address printed in the upper left corner. The signature on the check, which the videotape clearly showed the defendant writing, was the victim's name.

On appeal, the defendant relies on *State* v. *Cooke*, 42 Conn. App. 790, 682 A.2d 513 (1996), to support his proposition that the law requires the state to charge a defendant with either possession of a forged instrument *or* completion of a forged instrument. The defendant argues that on the basis of *Cooke*, the evidence presented by the state proves that the defendant completed a forged instrument, but not that he possessed a forged instrument. The defendant argues that the conviction of forgery in the second degree by possession of a forged instrument therefore must be reversed. The defendant incorrectly interprets and applies the holding of *Cooke* to the facts of the present case.

In *Cooke*, the defendant forged his wife's signature on a mortgage deed and then presented the deed to the bank as having been properly executed by his wife. Thereafter, the defendant was charged in two separate counts under § 53a-139 (a) (1), in one count with completing a forged document and in the other with possessing a forged document. Id., 802. The court held that "[t]he two crimes of which the defendant was convicted were different offenses and, thus, not in violation of the double jeopardy clause." Id.

The facts here are identical to those in *Cooke* with the exception that the state did not charge the defendant with two counts—one of completing and one of possessing a forged document. Here, the defendant was charged only with possession of a forged document. The facts, however, would have supported a charge of completing a forged instrument. The time that elapsed between the defendant's forging of the victim's signature and his passing of the instrument to the teller was sufficient to support the charge of possession. See *State v. Alfonso*, 195 Conn. 624, 633, 490 A.2d 75 (1985); *State v. Ogrinc*, supra, 29 Conn. App. 698. We conclude, therefore, that the evidence was sufficient to support the defendant's conviction on the charge of possession of a forged instrument.

### III

The defendant next claims that the state failed to introduce sufficient evidence to support his conviction of two counts of credit card theft in violation of § 53a-128c. Specifically, he asserts that the state did not present sufficient evidence from which the jury could have drawn the reasonable inference that the victim's VISA and Discover cards were credit cards that could be used to obtain money, goods or services on credit. We disagree.

Section 53a-128a (b) defines a credit card as: "any instrument or device, whether known as a credit card, as a credit plate, or by any other name, issued with or without fee by an issuer for the use of the cardholder in obtaining money, goods, services or anything else of value on credit." During her direct testimony, the victim identified the VISA card and the Discover card as items taken from her possession on March 16, 1993. The victim testified that both cards were her "credit cards," which were used to obtain "money, goods, or services."[4] The defendant did not cross-examine the witness and, after the state rested, moved to dismiss the three counts of credit card theft (VISA, Discover, and ATM cards) because there was insufficient evidence to support those charges. The trial court granted the motion as to the ATM card[5] but overruled the motion as to the VISA and Discover cards, reasoning that sufficient evidence existed from which a jury could reasonably infer that these cards were used to obtain money, goods or services on credit. We agree.

"In reviewing a sufficiency of evidence claim on appeal the question presented is whether, viewing the

[1] The following colloquy occurred during the direct examination of the victim:

"Q. [Showing the victim an item in evidence.] Can you tell the court and jury what that is?

"A. It's a VISA credit card. . . .

"Q. [Showing the victim another item in evidence.] Can you tell the court and the jury what it is?

"A. It's a Discover credit card in my name. . . .

"Q. [As to] the VISA card. Is this signature on the back your signature?

"A. Yes.

"Q. Now, was this particular card used to obtain money, goods or services?

"A. Yes.

"Q. Going to the Discover card . . . . Prior to its being stolen, was this particular card used to obtain money, goods or services?

"A. Yes."

[5] On direct examination, the victim identified the "ElectraCard" as an item used to obtain money. She never identified the ElectraCard as a credit card, nor did the state ask her if she was able to use this card to obtain money, goods or services on credit.

evidence favorably to sustaining the verdict, the trier could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt. *State* v. *Haddad,* 189 Conn. 383, 387, 456 A.2d 316 (1983)." *State* v. *Zayas,* 195 Conn. 611, 620, 490 A.2d 68 (1985).

We conclude that it is a reasonable and logical inference for a juror to conclude that a card referred to as a "credit card" enables one to receive things on credit.[6] "It is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom." Id. We find, therefore, that sufficient evidence existed to support the jury's finding of guilt.

## IV

The defendant next argues that the trial court should have granted his motion to dismiss because his case was transferred from New Britain to Hartford without his consent in violation of General Statutes § 51-353a.[7] In short, the defendant asserts that he is entitled to a new trial because the trial was heard in an improper venue. We conclude that the trial court properly denied the defendant's motion to dismiss on this ground.

Additional facts are necessary to our resolution of this claim. On March 18, 1993, the defendant was

---

[6] We note that in the defendant's brief he argues that "[n]o witness testified that the VISA card, the Discover card or the Electracard ATM card could be used 'to obtain money, goods or services *on credit.*' Conn. Gen. Stat. § 53a-128a (b)." (Emphasis added.) During argument before the trial court, defense counsel specifically stated that "you don't have to use the words 'on credit.' But someone has to either use the words 'on credit' or define the terms [of the VISA and Discover cards]."

[7] General Statutes § 51-353a provides: "Cases pending on the criminal docket of the superior court in any geographical area or judicial district may, with the consent of the accused and the state's attorney for such judicial district, be transferred to the criminal sessions of said court in any other judicial district or may be transferred to any other courthouse within the judicial district."

charged by information in geographical area number fifteen in New Britain, which is in the judicial district of Hartford-New Britain. The crimes were allegedly committed in the town of Wethersfield. On September 20, 1993, the case was transferred to the judicial district courthouse in Hartford, which is also in the judicial district of Hartford-New Britain, where the defendant was charged by substitute information on September 28, 1993.

General Statutes § 51-352 (a) provides that "[e]ach person charged with any offense shall be tried in the *judicial district in which the offense was committed,* except when it is otherwise provided." (Emphasis added.) Additionally, General Statutes § 51-347b (a) provides that "[a]ny action or the trial of any issue or issues therein may be transferred, by order of the court on its own motion . . . from the superior court for one judicial district to the superior court in another court location within the same district . . . ."

The defendant's assertion that his case was transferred improperly is not supported by the statutes because his case was transferred within the same judicial district. Accordingly, we affirm the trial court's denial of the defendant's motion to dismiss for improper venue.

V

The fifth claim presented by the defendant is that the trial court improperly denied his motion for a mistrial after the state purportedly violated the court's order resulting from a motion in limine.[8] The defendant claims

[8] The motion in limine related to information that would have tended to show that the defendant had sold stolen items on the day before the incident at issue in this case. The defendant argued that this was inadmissible evidence of uncharged misconduct. The trial court agreed and ordered that the state not elicit this information for that reason.

a mistrial was warranted because the jury was prejudiced by questions asked during the direct examination of the state's witness Marth, the store detective, and that the questions were asked in violation of the trial court's ruling. We disagree.

At trial, the state proffered the testimony of Marth regarding his observations of the defendant on the day prior to the alleged crimes. The defendant argued that Marth's observations on the previous day were not relevant to the pending charges and should be deemed inadmissible. In response, the state argued that the testimony would be offered to explain why Marth was interested in the defendant. The trial court held that the testimony would be admissible for that limited purpose.

The state asked Marth on direct examination if he recalled seeing the defendant in the store on the day prior to the incident. He responded in the affirmative and stated that he noticed the defendant because he had purchased several "high-ticket" items that could be easily resold on the street. The defendant objected on the grounds that this testimony consisted of uncharged misconduct and was prejudicial. The trial court sustained the objection and gave the jurors a cautionary instruction that they were to disregard the witness' statement.[9] Upon further questioning, the trial court allowed Marth to testify that the purchase of high-ticket items caused him concern and that was why he focused on the defendant on March 17.

---

[9] The court's instruction was as follows: "I'm also going to remind the jury that with respect to a question that was asked and answered, I told the jury to disregard the answer. And obviously when I indicate that you are to disregard an answer, you are to disregard it. And you're not to draw any inference from an answer that has been disregarded. So the fact that the witness has testified that it is a high-ticket item, I'm going—I permitted that. But with respect to any inference or conclusion that this witness attempted to draw, which was the subject of the answer that I indicated, you're to disregard, it is to be disregarded."

After the jury had been dismissed for the day, the defendant requested a mistrial, arguing that the instruction given was insufficient to cure the harm done to him and that the state had violated the court's prior ruling. The trial court denied this motion, finding that the state had not violated the prior order and that the curative instruction was sufficient. The trial court offered to give an additional curative instruction to the jury at the close of the trial if the defendant so desired. At the appropriate time, the defendant informed the court that he would not request an additional curative instruction as he did not want to "highlight [that] issue again."

"While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [It] should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . *State* v. *Wooten,* [227 Conn. 677, 693–94, 631 A.2d 271 (1993)]. On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. *State* v. *Rodriguez,* 210 Conn. 315, 333, 554 A.2d 1080 (1989); *State* v. *Bausman,* 162 Conn. 308, 312, 294 A.2d 312 (1972)." (Internal quotation marks omitted.) *State* v. *Bowman,* 46 Conn. App. 131, 136–37, 698 A.2d 908 (1997).

We conclude that given the curative instruction, the defendant has failed to show that the questioning complained of was of such a magnitude and character that as a result, he did not receive a fair trial.

## VI

The defendant's final claim[10] is that the trial court improperly denied his motion for a mistrial on the ground that the jury was indoctrinated on charges for which the state produced no evidence. We decline to review this claim due to inadequate briefing.

"We are not required to review issues that have been improperly presented to this court through an inadequate brief." *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 44–45, 699 A.2d 101 (1997). "Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Cummings* v. *Twin Tool Mfg. Co.*, 40 Conn. App. 36, 45, 668 A.2d 1346 (1996). On appeal, the defendant has presented us with nothing more than the assertion that "[b]ased on the prejudice [the defendant] suffered through the jury's indoctrination, the court abused its discretion in failing to grant the motion." We conclude

---

[10] The entire briefing of this claim is as follows: "Mr. Henderson also is entitled to a new trial because the trial court erred in denying his mistrial based on the indoctrination of the jury on charges for which the state had no evidence. The state's information that was read during jury selection and to the jury at the start of trial included charges of robbery in the first degree, attempted kidnapping in the first degree, assault in the second degree, forgery in the second degree, larceny in the sixth degree and three counts of credit card theft. Unquestionably the jurors' first impression of this case based on that indoctrination was one of a serious felony crime spree. At trial, however, it became apparent that the state had no evidence to support its charges of robbery in the first degree or attempted kidnapping in the first degree. Indeed, because of the absence of any proof on these charges the court granted Mr. Henderson's motions for acquittal. There can be little doubt that the jurors' minds were poisoned, and thus Mr. Henderson [was] prejudiced, by the jury's indoctrination on very serious crimes for which the state had no evidence. Mr. Henderson moved for a mistrial after his motions for judgment of acquittal were granted. Based on the prejudice Mr. Henderson suffered through the jury's indoctrination, the court abused its discretion in failing to grant the motion."

that the analysis is inadequate and, therefore, we decline to consider this claim.

The judgment is affirmed.

In this opinion the other judges concurred.

