## STATE OF CONNECTICUT *v.* CLARENCE LOVE
### (SC 15905)

Callahan, C. J., and Borden, Katz, Palmer and McDonald, Js.

Argued June 3—officially released August 18, 1998

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*Bruce R. Lockwood*, deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Alfred Baldwin*, former assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. Following a jury trial, the defendant, Clarence Love, was convicted of thirty-seven counts of larceny in the sixth degree in violation of General Statutes § 53a-125b (a),[1] five counts of credit card theft in violation of General Statutes § 53a-128c (a),[2] and

---

[1] General Statutes § 53a-125b (a) provides: "A person is guilty of larceny in the sixth degree when he commits larceny as defined in section 53a-119 and the value of the property or service is two hundred fifty dollars or less."

General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

[2] General Statutes § 53a-128c (a) provides in relevant part: "Any person who takes a credit card from the person, possession, custody or control of another without the consent of the cardholder or of the issuer or who, with knowledge that it has been so taken, receives the credit card with intent to use it or to sell it, or to transfer it to any person other than the issuer or the cardholder is guilty of credit card theft . . . ."

eighteen counts of forgery in the second degree in violation of General Statutes § 53a-139 (a) (1) and (3).[3] The trial court rendered judgment sentencing the defendant to a total effective sentence of twelve years imprisonment. On appeal,[4] the defendant challenges only his convictions of credit card theft.[5] Specifically, the defendant claims that the state failed to establish, as to each of the five counts, that the stolen card was in fact a "credit card" as that term is defined under General Statutes § 53a-128a (b).[6] With respect to one of the five counts, the state concedes that it failed to establish that the stolen card was a credit card for purposes of § 53a-128a (b) and, consequently, we reverse the judgment as to that count.[7] We affirm the judgment of the trial court, however, as to the remaining four counts of credit card theft.

The jury reasonably could have found the following facts. On May 6, 1994, the Windsor police arrested Mary

[3] General Statutes § 53a-139 (a) provides in relevant part: "A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed: (1) A deed, will, codicil, contract, assignment, commercial instrument or other instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status; or . . . (3) a written instrument officially issued or created by a public office, public servant or governmental instrumentality . . . ."

[4] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book § 65-1, and General Statutes § 51-199 (c).

[5] According to the defendant, his total effective sentence of twelve years imprisonment would be reduced by approximately 270 days if he prevails on all of his claims.

[6] General Statutes § 53a-128a (b) defines a credit card as "any instrument or device, whether known as a credit card, as a credit plate, or by any other name, issued with or without fee by an issuer for the use of the cardholder in obtaining money, goods, services or anything else of value on credit . . . ."

[7] This count, which concerned the theft of a stolen rent-a-center gold card, is set forth at count forty-one of the amended substitute information.

Poteat for attempting to cash a stolen check. Poteat told the police that the defendant had provided her with false identification cards and stolen checks, and that she had seen him forge birth certificates at his residence. On the basis of this information, the police obtained and executed a search warrant for the defendant's residence at 385 Sigourney Street in Hartford. The police seized a duffel bag and a briefcase containing numerous birth certificates, social security cards, telephone calling cards, check cashing and automated teller machine cards, drivers' licenses, checks and other miscellaneous cards and documents. The defendant's photograph was found on several pieces of forged identification.

At trial, numerous witnesses testified about the hundreds of items that had been discovered at the defendant's home. With respect to the cards that are the subject of this appeal, Betty Rooks, Johnna Davis and Michael Byrne each testified that someone had stolen his or her respective Southern New England Telephone calling card in April or May of 1994, and each identified his or her card as among the items that had been seized from the defendant's residence. All three witnesses stated that they had not loaned their cards to anyone or otherwise given anyone permission to use them. Each of the three calling cards carried the cardholder's full name and a four digit calling number, which is used with the cardholder's telephone number to charge calls to the cardholder's account. In addition, Rooks testified that, after the robbery, there were "phone calls on [her] bill that [she] didn't make and [she] didn't know of anyone [who] had made them."

Delores Glass testified that she had been an administrative assistant at the Connecticut alcohol and drug abuse commission (commission)[8] for eight years. Glass

[8] The alcohol and drug abuse commission is now the department of mental health and addiction services.

testified that she was one of three people who knew the combination to the commission safe, and that her desk was located immediately outside the room that housed the safe. Glass stated that, in May, 1994, she noticed that the door to the safe was ajar and, thereafter, she received a call from someone who had found the strong box that usually was kept inside the safe. Glass testified that an inventory of the strong box had revealed that "a few credit cards were missing." Glass identified four cards, each labeled "Sears MCA identification card," from among the items that had been recovered from the defendant's residence. She further testified that those cards had been issued to the commission.[9] The front of each card carried the customer account number, and the back contained the following language: "This is an identification card for use when making a purchase on a merchant credit account. Credit authorization is required." Glass also testified that shortly after she learned that the cards were missing, the commission began receiving bills from Sears for unauthorized purchases.

Glass also identified another item seized from the defendant's home as a document that the commission had received with the original Sears cards, which was last seen by commission personnel in the strong box along with those cards. This document provides in relevant part: "SEARS PRESENTS YOUR NEW MERCHANTS CREDIT ACCOUNT SALES IDENTIFICATION CARD. . . . Attached, are two IDENTIFICATION CARDS referencing your CUSTOMER NUMBER, the name of your Company/Organization, and your specific Purchase Order requirements if applicable. Please be certain to present this IDENTIFICATION CARD at the time of purchase."

---

[9] Although four Sears cards were found at the defendant's residence, only one of those cards is the subject of this appeal. Moreover, the four Sears cards, which display the same account number, are, in all respects, identical to each other.

On appeal, the defendant claims that the state failed to adduce evidence sufficient to establish that the three calling cards and the Sears card were credit cards within the meaning of § 53a-128a (b). Specifically, the defendant asserts that the state did not prove that the cards were issued for the use of the cardholder in obtaining money, goods or services on "credit" as required by that statutory subsection.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State v. Torres*, 242 Conn. 485, 489, 698 A.2d 898 (1997). Thus, "[t]his court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) Id., 490. Furthermore, "[i]n reviewing the jury verdict, it is well to remember that [j]urors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) Id., 491; see also *State v. Zayas*, 195 Conn. 611, 620, 490 A.2d 68 (1985) ("[i]t is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom"); *State v. Henderson*, 47 Conn. App. 542, 554, 706 A.2d 480, cert. denied, 244 Conn. 908, 713 A.2d 829 (1998) (jury entitled to use common sense in determining what qualifies as credit card under § 53a-128a [b]). Upon application of these principles, we are persuaded that the evidence

was sufficient to support the jury's conclusion that the Southern New England Telephone calling cards and the Sears card enabled the cardholders to obtain goods and services on "credit."

We note, preliminarily, that the word "credit" is not defined in § 53a-128a (b). "If a statute . . . does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *State* v. *Payne*, 240 Conn. 766, 771, 695 A.2d 525 (1997). "Credit" is defined in the dictionary as "time given for payment for goods or services sold for future payment." Webster's Third New International Dictionary. We now turn to the defendant's claims.

The defendant first contends that the state failed to prove that the Sears card allows a cardholder to make purchases on credit. According to the defendant, the card is for identification purposes only, and a cardholder still needs a separate authorization to obtain credit at Sears. The defendant further contends that, because the state failed to adduce testimony explaining precisely how the card was used by commission employees to purchase goods and services, the jury was required to speculate as to whether the card was, in fact, used to obtain credit within the meaning of § 53a-128a (b).

We are not persuaded by the defendant's arguments. Viewing the evidence in the light most favorable to the state, the jury reasonably could have concluded that a person presenting the Sears card would be allowed to purchase goods or services at Sears without tendering payment at that time. A card that allows its holder to make such a deferred payment satisfies the definition of credit card under § 53a-128a (b). Moreover, the explanatory document that accompanied the Sears card expressly states that the commission had opened a

"merchants *credit* account"; (emphasis added); and that commission employees could make purchases on a deferred payment basis simply by presenting the Sears card at the time of purchase.[10] Finally, as the defendant concedes, Glass, the commission representative, characterized the Sears card as a credit card based upon her understanding of how the card was used by commission employees to purchase goods and services. See *State v. Henderson*, supra, 47 Conn. App. 554 ("[w]e conclude that it is a reasonable and logical inference for a juror to conclude that a card referred to as a 'credit card' enables one to receive things on credit"). We are satisfied, therefore, that the evidence supported the jury's determination that the Sears card was a card issued by Sears to the commission so that it could, through its use of the card, obtain goods and services on credit within the meaning of § 53a-128a (b).

The defendant next claims that a Southern New England Telephone calling card is not a credit card, but, rather, a device that merely allows a person to gain access to an existing telephone account from a remote location. The defendant argues that the card reasonably cannot be considered a credit card because a person seeking to use the card must also know the telephone number of the cardholder in order to charge a telephone call to the card. The defendant also claims that a telephone calling card lacks certain characteristics commonly associated with credit cards, such as a monthly interest charge on unpaid balances, an annual fee and a minimum payment requirement. In addition, the defendant asserts that the calling card does not meet the definition of credit card in § 53a-128a (b) because a telephone call can be charged to a particular account by use of the number contained on the card irrespective of whether the person placing the call actually is in

---

[10] This explanatory document also referenced the customer account number contained on the cards.

possession of the card. This fact, according to the defendant, distinguishes calling cards from other credit cards that are physically scanned by electronic means before the charge is accepted.[11] Finally, the defendant maintains that calling cards do not fall within the intended scope of § 53a-128a (b) because virtually all utility services are provided on a deferred payment basis and, consequently, it is unlikely that the legislature sought to include calling card theft under § 53a-128c (a).[12] We disagree with these arguments.

The defendant's assertion that the calling cards do not fall within the definition of § 53a-128a (b) because the cards lack some of the information necessary to charge a telephone call is unpersuasive. Each of the calling cards contains the owner's full name and the four digit code necessary for its use. It reasonably may be presumed that the cardholder knows his or her own telephone number, the only additional information that is needed for a call to be charged to the cardholder's account. Moreover, a person other than the cardholder who does not know the cardholder's telephone number, but who nevertheless seeks to use the card to access the cardholder's telephone account, generally can obtain such information by resort either to the telephone book or the information operator.

[11] The defendant relies on *United States* v. *Callihan*, 666 F.2d 422 (9th Cir. 1982), as support for the proposition that credit card theft statutes "[address] physical instruments or devices, not account numbers or intangible things." The court in *Callihan* held that, under the federal credit card theft statute, fraudulently obtaining a calling card number without stealing the actual calling card itself did not constitute credit card theft. Id., 423. *Callihan* is inapposite, therefore, because in this case, the defendant was charged with theft of the calling cards themselves.

[12] The defendant also claims that we should not construe § 53a-128a (b) to encompass calling cards because utility credit is exempt from the definition of credit under the federal Truth in Lending Act and, further, because credit card fraud may be prosecuted under federal law. We need not undertake a thorough review of these federal statutory provisions, however, because the defendant has failed to persuade us why federal law has any

Furthermore, we reject the argument that a calling card is not a credit card simply because the cardholder pays no fee for the extension of credit. Section 53a-128a (b) contains no such requirement. We also reject the defendant's claim that a calling card is not a credit card because a charge can be made to the account identified on the card even though the person placing the call is not actually in possession of the card. There is nothing in § 53a-128a (b) to suggest that a card does not fit the definition of credit card simply because the person seeking to obtain credit need not be in possession of the card or because the card need not be displayed as a condition to the issuance of credit. Indeed, credit cards are often honored without the cardholder physically presenting the card to the party supplying the goods or services for payment in the future.

Finally, we also reject the defendant's argument that the legislature intended to exempt utility credit from the purview of the credit card theft statute. General Statutes § 53a-128c (a). Our review of the history and purpose of the credit card theft statute reveals no indication that the legislature intended to narrow the ordinary meaning of the term "credit" as the defendant maintains. For example, during deliberations on the legislation in the Senate, the law's purpose was broadly defined as "[giving] protection to the person, who perhaps loses his credit card through theft or other reason and to give him protection under the law . . . and to give equal results to responsible firms which are issuing credit through credit cards." 13 S. Proc., Pt. 7, 1969 Sess., p. 3506, remarks of Senator John F. Pickett, Jr. The legislative purpose of protecting consumers from the theft of their credit cards applies fully to the defendant's illegal receipt of the calling cards; if the legislature had intended to limit the scope of the credit card

bearing on our determination of whether the calling cards at issue in this case fall within the definition of credit card in § 53a-128a (b).

theft statute by excluding calling cards like the calling cards at issue in this case, it easily could have done so. See *LoPresto* v. *State Employees Retirement Commission*, 234 Conn. 424, 435, 662 A.2d 738 (1995). "We will not impute to the legislature an intent to limit [a] term where such intent does not otherwise appear in the language of the statute."[13] *Stein* v. *Hillebrand*, 240 Conn. 35, 40, 688 A.2d 1317 (1997). Thus, contrary to the defendant's arguments, a Southern New England Telephone calling card is a credit card within the meaning of § 53a-128a (b) because it is used to purchase telephone services for which payment is to be made in the future.

We conclude, therefore, that the jury reasonably could have found that the Sears card and the Southern New England Telephone calling cards constitute "device[s] . . . issued . . . by an issuer for the use of the cardholder in obtaining money, goods, services or anything else of value on credit" under § 53a-128a (b). Accordingly, the defendant has failed to demonstrate that he is entitled to reversal of the judgment of conviction rendered against him with respect to the four counts charging him with the illegal receipt of those cards.

The judgment is reversed only as to count forty-one of the amended substitute information and the case is

---

[13] Of course, "[w]e have long held that [c]riminal statutes are not to be read more broadly than their language plainly requires . . . . Moreover, [a] penal statute must be construed strictly against the state and liberally in favor of the accused. . . . [A]mbiguities are ordinarily to be resolved in favor of the defendant." (Citations omitted; internal quotation marks omitted.) *State* v. *Crowell*, 228 Conn. 393, 400, 636 A.2d 804 (1994). "In the interpretation of statutory provisions [however] the application of common sense to the language is not to be excluded." (Internal quotation marks omitted.) *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 741, 687 A.2d 506 (1997). Thus, "[e]ven applying the view that a penal statute should be strictly construed, the words of a statute are to be construed with common sense and according to the commonly approved usage of the language." (Internal quotation marks omitted.) *State* v. *Ingram*, 43 Conn. App. 801, 825, 687 A.2d 1279 (1996), cert. denied, 240 Conn. 908, 689 A.2d 472 (1997).

remanded to the trial court with direction to render a judgment of acquittal as to that count. The judgment otherwise is affirmed.

In this opinion the other justices concurred.