## STATE OF CONNECTICUT *v.* EDWIN SANDOVAL
(SC 16660)

Sullivan, C. J., and Borden, Palmer, Vertefeuille and Zarella, Js.

Argued March 20, 2002—officially released May 13, 2003

*Paula J. Waite*, with whom, on the brief, was *William T. Gerace*, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom were *Lisa Herskowitz*, assistant state's attorney, and, on the brief, *James E. Thomas*, state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Edwin Sandoval, guilty of one count each of the crimes of attempt to commit aggravated sexual assault in the first degree

in violation of General Statutes §§ 53a-70a (a) (2)[1] and 53a-49 (a) (2),[2] sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1),[3] and attempt to commit assault in the second degree in violation of General Statutes §§ 53a-60 (a) (1)[4] and 53a-49 (a) (2), and two counts each of the crimes of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a)[5] and 53a-49 (a) (2), and

---

[1] General Statutes § 53a-70a (a) provides in relevant part: "A person is guilty of aggravated sexual assault in the first degree when such person commits sexual assault in the first degree as provided in section 53a-70, and in the commission of such offense . . . (2) with intent to disfigure the victim seriously and permanently, or to destroy, amputate or disable permanently a member or organ of the victim's body, such person causes such injury to such victim . . . ."

For the relevant text of General Statutes § 53a-70, see footnote 3 of this opinion.

[2] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[4] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person . . . ."

[5] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person . . . ."

The defendant was found guilty of one count of attempt to commit assault in the first degree in violation of §§ 53a-59 (a) (1) and 53a-49 (a) (2), and one count of attempt to commit assault in the first degree in violation of §§ 53a-59 (a) (2) and 53a-49 (a) (2).

assault in the second degree in violation of § 53a-60 (a).[6] The trial court rendered judgment[7] in accordance with the jury verdict,[8] from which the defendant appealed. On appeal,[9] the defendant claims that the trial court improperly: (1) admitted into evidence a prior consistent statement of the victim; (2) precluded him from introducing certain evidence; (3) denied his motion for a judgment of acquittal on the charges of attempt to commit aggravated sexual assault in the first degree and attempt to commit assault in the first degree; and (4) instructed the jury to disregard testimony that the victim had applied to the state office of victim services for compensation. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 5, 1998, the defendant, an engineer, and the victim,[10] a medical assistant, had been involved

---

[6] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm; or . . . (4) for a purpose other than lawful medical or therapeutic treatment, he intentionally causes stupor, unconsciousness or other physical impairment or injury to another person by administering to such person, without his consent, a drug, substance or preparation capable of producing the same . . . ."

The defendant was found guilty of one count of assault in the second degree in violation of § 53a-60 (a) (2) and one count of assault in the second degree in violation of § 53a-60 (a) (4).

[7] The trial court sentenced the defendant to a total effective term of sixteen years imprisonment, execution suspended after twelve years, and ten years probation.

[8] The jury found the defendant not guilty of two counts each of the crimes of assault in the first degree and assault in the second degree, and one count each of the crimes of aggravated sexual assault in the first degree, attempt to commit coercion, and tampering with a witness.

[9] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[10] Pursuant to General Statutes § 54-86e, we do not refer to the victim by name in this opinion in order to protect her privacy interests.

in an exclusive, intimate relationship for approximately four years.[11] On that date, the victim learned that she was pregnant and so informed the defendant. The defendant indicated that he did not want the victim to have the baby and urged her to have an abortion. The victim stated that she would not do so, and the defendant responded angrily. The next day, however, the defendant spoke to the victim on the telephone and told her that they should not fight about the matter, and that they would work something out.

On August 9, 1998, the defendant went to the victim's home, ostensibly to have breakfast. The defendant indicated that he was not hungry, however, and asked the victim to have sex with him. The victim agreed, and the couple proceeded to engage in intercourse. At one point, the defendant inserted his fingers into the victim's vagina, something that he never before had done to her. The defendant stopped, however, when the victim told him that he was hurting her.

The next day, August 10, 1998, the defendant returned to the victim's home for breakfast. After breakfast, the defendant asked the victim to have sex with him, and she agreed. Despite the victim's protests, the defendant again inserted his fingers into the victim's vagina, causing her significant pain. The victim told the defendant to stop, but he would not do so. Eventually, however, the victim was able to push the defendant away from her. She then told him to leave, which he did. Soon thereafter, the victim lay down and fell asleep.

The victim awoke at approximately 11 a.m. and discovered that she was experiencing vaginal bleeding. At approximately 2:45 p.m. that same day, the victim went to see Marcia Waitzman, an obstetrician-gynecologist.

---

[11] Both the victim and the defendant are originally from Peru. Although they were friends in Peru, they never were involved romantically until they both had immigrated to this country.

Upon arriving at Waitzman's office, the victim explained to Waitzman that the defendant had inserted his fingers into her vagina against her will, causing her pain. While conducting an internal examination of the victim, Waitzman discovered two pills located approximately three to four inches inside the victim's vagina. The victim told Waitzman that she was unaware that the pills were there and indicated that the defendant must have inserted them into her vagina without her knowledge.

Both of the pills that Waitzman had found in the victim's vagina bore the legends "Searle" and "1461." Waitzman identified the pills as Cytotec,[12] a prescription medication containing misoprostol. Misoprostol is an abortifacient that can cause a woman to suffer a miscarriage by inducing strong uterine contractions.[13] According to Waitzman, the vaginal bleeding that the victim experienced was consistent with exposure to misoprostol, which, in small doses, is used to induce labor.[14]

After completing her examination of the victim, Waitzman placed the two pills in a plastic container and telephoned the Glastonbury police department to report the incident. The victim took the pills to the Glastonbury police department and turned them over to Officer William Sanderson, who sent them to the state toxicology laboratory for analysis. The victim told Sanderson about the defendant's request that she have an abortion, her refusal to do so and the defendant's subsequent acts of inserting his fingers into her vagina against her will. The victim signed a written statement detailing those events.

---

[12] Tablets bearing the legends "Searle" and "1461" are identified as 200 microgram Cytotec tablets. See Physician's Desk Reference (56th Ed. 2002) p. 336. They are manufactured by a pharmaceutical company known as G. D. Searle and Company. Id.

[13] See, e.g., Physician's Desk Reference (56th Ed. 2002) pp. 3202–3203.

[14] See, e.g., G. Briggs et al., Drugs in Pregnancy and Lactation (6th Ed. 2002) p. 944.

Two days later, on August 12, 1998, the victim called the defendant at his place of employment, explained to him that she knew what he had done to her and asked him why. After initially refusing to answer, the defendant told the victim that he had done so to protect himself because he did not want to have a child with her. The defendant continued to urge the victim to have an abortion, but when she emphatically refused to terminate the pregnancy, the defendant threatened to kill her if she told anyone about what had happened.

On August 14, 1998, the police sought and obtained a search warrant for the defendant's home. Upon executing the warrant, the police found, inter alia, a plate with a white powder residue, an emery board, a silver metal hammer, instructions in Spanish for administering medication orally and intravaginally and three white pills bearing the legends "Searle" and "1461."[15] The police sent the plate, the emery board and one of the white pills to be analyzed by the state toxicology laboratory.

On August 17, 1998, the victim returned to the police department and provided the police with a second statement. She also spoke to Beverly Warga, the victim services coordinator for the Glastonbury police department, about having been assaulted sexually by the defendant. As required by law, Warga informed the victim of her right to seek compensation from the state office of victim services. See General Statutes § 54-220 (a). The victim subsequently filed an application for compensation with that office pursuant to General Statutes § 54-204.

Thereafter, the state toxicology laboratory issued its report regarding the two pills that had been recovered from the victim's vagina and one of the pills that had

---

[15] The defendant has a brother who is a physician and who resides in Peru, where misoprostol is used to abort pregnancies.

been seized from the defendant's home. Laboratory personnel concluded that each of the pills contained misoprostol.[16] Additional facts will be provided as necessary.

I

The defendant first claims that the trial court improperly permitted the state to introduce the victim's prior consistent statement and that such impropriety constituted a violation of his rights under the confrontation clause of the sixth amendment to the United States constitution.[17] We disagree.

The following additional facts are necessary to our resolution of this claim. On direct examination, the victim testified about her relationship with the defendant and the events leading up to the discovery of the two pills in her vagina. On cross-examination, defense counsel inquired into the victim's application for compensation that the victim had filed with the state office of victim services. The victim explained that, upon her second visit to the police department on August 17, 1998, she had spoken to Warga, who advised her of her right to seek such compensation. The victim further testified that she thereafter submitted an application for compensation to the office of victim services.

[16] Joel Milzoff, a forensic toxicologist and section manager of the state toxicology laboratory, testified that the residue and the emery board were not tested, primarily because of the laboratory's "limited resources . . . ." Milzoff also indicated that the state had made no additional requests to analyze the plate with the white powder residue or the emery board.

[17] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The confrontation clause of the sixth amendment is made applicable to the states through the due process clause of the fourteenth amendment. See *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

The defendant also claims a violation of his rights under the confrontation clause of article first, § 8, of the constitution of Connecticut. Because he provides no independent analysis of his state constitutional claim, however, we limit our review to his federal constitutional claim. See, e.g., *State* v. *DeCaro*, 252 Conn. 229, 255 n.21, 745 A.2d 800 (2000).

Following the victim's testimony, Sanderson testified for the state. Sanderson stated that he was on duty on August 10, 1998, when the victim had arrived at the police station to lodge a criminal complaint against the defendant. According to Sanderson, the victim provided him with a detailed explanation of the facts relating to her allegations against the defendant and, without objection, Sanderson summarized those facts for the jury. Sanderson further testified that he also had taken a written statement from the victim.

The state then sought to introduce that written statement into evidence as a prior consistent statement pursuant to § 6-11 (b) of the Connecticut Code of Evidence.[18] Over defense counsel's objection, the trial court allowed the state to introduce the statement into evidence for the limited purpose of rebutting the inference, raised by defense counsel during his cross-examination of the victim, that the victim's testimony had been motivated by a desire to obtain compensation from the office of victim services. Thereafter, the court

[18] Section 6-11 of the Connecticut Code of Evidence provides: "(a) General rule. Except as provided in this section, the credibility of a witness may not be supported by evidence of a prior consistent statement made by the witness.

"(b) Prior consistent statement of a witness. If the credibility of a witness is impeached by (1) a prior inconsistent statement of the witness, (2) a suggestion of bias, interest or improper motive that was not present at the time the witness made the prior consistent statement, or (3) a suggestion of recent contrivance, evidence of a prior consistent statement made by the witness is admissible, in the discretion of the court, to rebut the impeachment.

"(c) Constancy of accusation by a sexual assault victim. A person to whom a sexual assault victim has reported the alleged assault may testify that the allegation was made and when it was made, provided the victim has testified to the facts of the alleged assault and to the identity of the person or persons to whom the assault was reported. Any testimony by the witness about details of the assault shall be limited to those details necessary to associate the victim's allegations with the pending charge. The testimony of the witness is admissible only to corroborate the victim's testimony and not for substantive purposes."

explained to the jury that it could use the victim's statement solely for the purpose of evaluating the victim's credibility and not as evidence of the truth of the matter asserted therein.

Waitzman subsequently testified about her examination of the victim on August 10, 1998, and her discovery of the two pills in the victim's vagina. Waitzman also testified about what the victim had told her during the examination. In particular, Waitzman testified that the victim had explained that the defendant had inserted his fingers into her vagina against her will.

Finally, at the conclusion of the case, the trial court instructed the jury that "[t]he fact that there was or was not a claim [for compensation filed by the victim with the office of victim services], as well as the fact that a claim was or was not paid, is not important to your determination . . . and has no bearing upon the decisions that you must make . . . ." Defense counsel objected to this charge on the ground that the instruction improperly "add[ed] evidence to the case."

On appeal, the defendant's primary contention is that the trial court improperly allowed the state to introduce the victim's written statement through Sanderson, rather than through the victim, because defense counsel did not have an opportunity to cross-examine the victim about the statement.[19] We initially note that "[a criminal] defendant is entitled to confront and cross-examine fairly and fully the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motiva-

[19] For purposes of clarification, we note that defense counsel had cross-examined the victim earlier in the trial but the state introduced the victim's statement through Sanderson after the victim had concluded her testimony. As we note later in this opinion, the trial court precluded defense counsel from calling the victim as a witness later in the trial and from performing further cross-examination. See footnote 21 and part II of this opinion.

tion in testifying. . . . In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 218–19, 690 A.2d 1370 (1997).

We reject the defendant's claim because the victim's statement, if otherwise admissible under § 6-11 (b) of the Connecticut Code of Evidence as a prior consistent statement, properly was authenticated and admitted through the person who had taken the statement, namely, Sanderson.[20] See Conn. Code Evid. § 6-11 (b). Nothing in § 6-11 (b) of the Connecticut Code of Evidence, which authorizes the admission of prior consistent statements for the limited purpose of rehabilitating the credibility of an impeached witness, requires that the witness' prior consistent statement be introduced through the witness himself, especially when the prior consistent statement is used to rebut a suggestion of bias, interest or improper motive, as it was in the present case. See, e.g., *State* v. *Chance*, 236 Conn. 31, 58, 671 A.2d 323 (1996) (evidence regarding motive, bias or interest never collateral). Furthermore, in light of the fact that prior consistent statements introduced under § 6-11 (b) are not admissible for the truth of the matter asserted; e.g., Conn. Code Evid. § 6-11 (b), commentary; the necessity of having the declarant avail-

---

[20] The defendant has pointed to no authority, and we are aware of none, to support his contrary assertion.

able for cross-examination with respect to the prior consistent statement is substantially diminished. Cf. Conn. Code Evid. § 8-5 (1) (prior inconsistent statements used to impeach declarant may be admitted substantively only if, among other things, declarant has testified at trial and is subject to cross-examination).

The victim's prior consistent statement was not admitted for the truth of the matter asserted but, rather, for the limited purpose of rehabilitating the victim's credibility. The state, in introducing the victim's prior consistent statement, sought to rehabilitate the credibility of the victim, which had been impeached by virtue of defense counsel's suggestion that the victim's testimony had been motivated by a desire to collect compensation from the office of victim services. Specifically, the state, in introducing the victim's prior consistent statement, sought to establish that the victim had given a similar statement before the alleged motive arose, thereby bolstering her credibility. See Conn. Code Evid. § 6-11 (b); see also *State* v. *Anonymous*, 190 Conn. 715, 728, 463 A.2d 533 (1983). In addition, Sanderson had firsthand knowledge of the fact that the statement had occurred and was subject to cross-examination regarding the statement and the circumstances under which it was made.[21]

---

[21] As the defendant notes, defense counsel did subpoena the victim to testify in the defendant's case-in-chief. The trial court, however, quashed the subpoena upon motion of the state, concluding that the sole reason offered by defense counsel in support of the subpoena, namely, to elicit testimony from the victim regarding an alleged prior abortion, constituted an insufficient reason to require her to testify in the defendant's case-in-chief. See part II of this opinion. At no time did defense counsel explain to the court that he sought to question the victim about her August 10, 1998 statement that she had given to Sanderson. Inasmuch as defense counsel had failed to alert the court of this reason for calling the victim as a witness, the court did not consider it in ruling on the state's motion to quash the subpoena. Having failed to bring the issue of the victim's statement to the trial court's attention, the defendant cannot now complain that the court improperly deprived him of the opportunity to examine the victim about that statement. See, e.g., *Simmons* v. *Simmons*, 244 Conn. 158, 187, 708 A.2d 949 (1998) ("to review a [nonconstitutional] claim . . . articulated for

The defendant also asserts that "the trial court's decision to admit the statement was an abuse of discretion and resulted in substantial prejudice to the [defendant]." The defendant, however, has articulated no reason why the trial court abused its discretion in allowing the state to use the victim's prior consistent statement in accordance with § 6-11 (b) of the Connecticut Code of Evidence. The defendant also has failed to establish that the admission of the statement was unduly prejudicial, especially in light of: (1) Sanderson's testimony, elicited by the state without objection from the defendant, in which Sanderson recited the details of the victim's complaint;[22] (2) Waitzman's testimony, also unchallenged by the defendant, in which Waitzman repeated the statements that the victim had made to her during her examination on August 10, 1998;[23] and (3) the trial court's admonition to the jury that it could use the victim's statement only for the purpose of evaluating the victim's credibility and not as substantive evidence.[24] We therefore reject the defendant's claim that

the first time on appeal . . . would result in a trial by ambuscade of the trial judge" [internal quotation marks omitted]).

[22] The victim's oral complaint was substantially similar to her written statement.

[23] "It is well settled that out-of-court statements made by a patient to a physician for the purposes of obtaining medical diagnosis and treatment are admissible under the treating physician exception to the hearsay rule." *State* v. *Kelly*, 256 Conn. 23, 44, 770 A.2d 908 (2001); see also Conn. Code Evid. § 8-3 (5).

[24] As the defendant notes, the trial court, sua sponte, instructed the jury to disregard the victim's cross-examination testimony regarding her application for compensation, thereby eliminating the sole basis for allowing the state to introduce the victim's prior consistent statement into evidence. We agree with the defendant that this instruction was improper. When the court allowed the state to introduce the victim's prior consistent statement, however, no such charge had been requested or, as far as the record reflects, contemplated. We do not believe, therefore, that that instruction rendered the court's ruling on the state's use of the victim's prior consistent statement an abuse of discretion. Even if we were to deem the court's ruling to be an abuse of discretion in light of the court's subsequent instruction, however, the admission of the statement was harmless in view of the testimony of Sanderson and Waitzman about the victim's *oral* statements.

the state's use of the victim's written statement violated his confrontation clause rights or otherwise was improper.[25]

## II

The defendant next contends that the trial court improperly excluded certain evidence in violation of his sixth amendment right to present a defense. We disagree.

The following additional facts and procedural history are necessary to our resolution of this claim. On cross-examination, defense counsel challenged the victim's testimony on direct examination that she had rejected the defendant's entreaties to abort her pregnancy. Specifically, defense counsel, in questioning the victim, sought to establish, contrary to the victim's direct examination testimony, that: (1) she had agreed to abort the pregnancy by use of an abortifacient; (2) she had allowed the defendant to insert the two Cytotec pills into her vagina for the purpose of aborting the pregnancy; (3) she thereafter had changed her mind about aborting the pregnancy before the pills dissolved inside her vagina; and (4) she had falsely accused the defendant of seeking to abort the pregnancy without her knowledge or consent.[26] The victim testified that at no time did she agree to terminate the pregnancy,

[25] The defendant also asserts that the victim's prior statement contained information inadmissible under § 6-11 (c) of the Connecticut Code of Evidence; see footnote 18 of this opinion; which permits the use of constancy of accusation evidence. The statement was not admitted as constancy of accusation evidence, however, and, therefore, § 6-11 (c) of the Connecticut Code of Evidence bears no relevance to our determination of the propriety of the court's ruling on the admissibility of the victim's statement.

[26] We note, moreover, that, during closing arguments, defense counsel posited several alternative explanations regarding the circumstances under which the pills may have been placed in the victim's vagina, among them the possibility that the victim, after allowing the defendant to insert the pills into her vagina for the purpose of aborting the pregnancy, falsely accused the defendant of doing so without her knowledge or consent.

explaining that she never had entertained even the possibility of doing so.

Defense counsel then elicited testimony from the victim that the defendant previously had impregnated her and that she had aborted that earlier pregnancy in July, 1997,[27] at the defendant's urging. The victim also explained that she had terminated that pregnancy because, at the time, the victim's daughter[28] resided in Peru, and the victim, who was attempting to bring her daughter to this country, believed that her daughter's father would not allow her daughter to emigrate to the United States if the victim became pregnant. The victim also testified, however, that her decision to have the 1997 abortion was a painful experience and a "poor choice," one that she would not make again. On redirect examination, the victim elaborated on the degree of anguish that she had suffered after the 1997 abortion, indicating that the experience had profoundly affected her decision to have the baby when she became pregnant by the defendant in 1998.[29]

After the state concluded its case-in-chief, defense counsel informed the court that he had subpoenaed the victim to testify as a defense witness. The state moved to quash the subpoena, and defense counsel, in response to the state's motion, made an offer of proof regarding the testimony that he claimed he would elicit from the victim. Specifically, defense counsel informed the court that he intended to adduce testimony from the victim that she had been intimate with a man other than the defendant prior to August, 1998, that she had become pregnant by this other man, and that she had

---

[27] We hereinafter refer to this abortion as the 1997 abortion.

[28] The defendant is not the father of this child.

[29] For ease of reference, we hereinafter refer to this pregnancy, which is the pregnancy that the jury found the defendant surreptitiously had attempted to abort, as the August, 1998 pregnancy.

aborted that pregnancy in early 1998.[30] Defense counsel stated that he sought to introduce the proffered testimony[31] to rebut the state's contention, brought out through the victim's testimony in the state's case, that she never had seriously considered terminating her August, 1998 pregnancy because of the mental anguish that she had suffered in connection with the 1997 abortion.[32]

The trial court granted the state's motion to quash,[33] concluding that the victim's testimony had limited, if any, relevance. The court further concluded that, under Connecticut Code of Evidence § 4-3,[34] any possible probative value of the evidence was outweighed by "the danger of unfair prejudice, surprise, confusion of the

[30] We hereinafter refer to this alleged abortion as the 1998 abortion.

[31] Defense counsel explained that he had not cross-examined the victim about this alleged 1998 abortion because he did not learn of it until after the victim had completed her testimony for the state. The state did not contest that representation at trial and does not do so on appeal.

[32] In connection with his offer of proof, defense counsel requested that he be allowed to examine the victim outside the presence of the jury. The trial court denied this request. The trial court concluded that, even it were assumed that the victim would testify in a manner consistent with defense counsel's proffer, defense counsel still was not entitled to call the victim as a witness. Inasmuch as the trial court precluded defense counsel from conducting a voir dire examination of the victim, we do not know whether the victim would have testified in a manner consistent with defense counsel's proffer. We, like the trial court, assume, solely for the purpose of reviewing the court's ruling on the motion to quash, that the victim would have acknowledged, during defense counsel's voir dire, that she had become pregnant in early 1998 by a man other than the defendant and that she had aborted that pregnancy prior to her August, 1998 pregnancy by the defendant.

[33] The state moved to quash the subpoena on the ground that the testimony that defense counsel sought to adduce from the victim violated the rape shield statute; General Statutes § 54-86f; see also Conn. Code Evid. § 4-11; and on the ground that the victim's proffered testimony would involve collateral matters.

[34] Section 4-3 of the Connecticut Code of Evidence provides: "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

issues, misleading of the jury or [by] considerations of undue delay, waste of time, [and] of needless presentation of [cumulative] evidence."

Defense counsel then sought to call the other man by whom the victim purportedly had become pregnant in early 1998. According to defense counsel's proffer, this witness, if permitted to testify, would have confirmed that he had impregnated the victim and that she had aborted that pregnancy. Alternatively, defense counsel sought to introduce medical records relating to that 1998 abortion.[35] The trial court precluded defense counsel from introducing this evidence for the same reason that it granted the state's motion to quash the subpoena that defense counsel had served on the victim.[36]

On appeal, the defendant claims that the trial court violated his right to present a defense by preventing defense counsel from introducing evidence of the 1998 abortion. In essence, the defendant claims that this evidence would have undermined a key component of the state's case, namely, that the victim refused to abort her August, 1998 pregnancy because of the mental anguish that she had suffered in connection with the 1997 abortion. We conclude that the defendant cannot prevail on his constitutional claim.

We begin our analysis with a review of the governing legal principles. "The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The

---

[35] Defense counsel acknowledged that he did not have those medical records in his possession. He indicated, however, that he would obtain them promptly if allowed to introduce them into evidence.

[36] We reiterate that we will assume, for the purpose of reviewing the court's ruling on the state's motion to quash, that the evidence adduced by defense counsel on voir dire would have established that the victim had become pregnant by a man other than the defendant and that she had aborted that pregnancy in 1998. See footnote 32 of this opinion.

sixth amendment . . . includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies."[37] (Citation omitted; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 260–61, 796 A.2d 1176 (2002).

"A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 366, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003). Thus, our law is clear that a defendant may introduce "only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated." *State* v. *Cerreta*, supra, 260 Conn. 261.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it

[37] "The right to compulsory process is fundamental to due process of law and is applied to state prosecutions through the due process clause of the fourteenth amendment. *Washington* v. *Texas*, 388 U.S. 14, 18–19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)." *State* v. *Cerreta*, 260 Conn. 251, 261 n.8, 796 A.2d 1176 (2002).

is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not [unfairly] prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 123–24, 763 A.2d 1 (2000); see also Conn. Code Evid. § 4-1.

Finally, "[i]t is well established that a trial court has broad discretion in ruling on evidentiary matters, including matters related to relevancy. . . . Accordingly, the trial court's ruling is entitled to every reasonable presumption in its favor . . . and we will disturb the ruling only if the defendant can demonstrate a clear abuse of the court's discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Cerreta*, supra, 260 Conn. 260.

Applying these principles, we turn to the defendant's claim that the trial court abused its discretion in excluding the proffered evidence. The victim testified that she had refused to terminate her August, 1998 pregnancy because she never would have aborted that pregnancy in light of the emotional anguish that she had experienced after her 1997 abortion. The defendant contends that this testimony was an important part of the state's case inasmuch as it explained why the victim had refused to abort her August, 1998 pregnancy. The defendant further contends that the proffered evidence would have called into question the victim's explanation for refusing to abort her August, 1998 pregnancy and, therefore, would have cast doubt on the state's theory of the case, because it is unlikely that the victim would have agreed to the 1998 abortion if she truly had been upset over aborting the 1997 pregnancy. We conclude that the proffered evidence was relevant because it reasonably can be viewed as undermining the state's proof

that the victim never would have agreed to abort her August, 1998 pregnancy.[38]

The state nevertheless contends that the trial court properly excluded the proffered evidence on the ground that its probative value was outweighed by the danger of unfair prejudice. See Conn. Code Evid. § 4-3. Specifically, the state argues that the court reasonably concluded that the proffered evidence "would . . . needlessly have aroused the jury's hostility for the victim and its sympathy for the defendant." Although this issue presents a close question, we are persuaded that the trial court improperly precluded defense counsel from introducing the proffered evidence.

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value." (Internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 329, 746 A.2d 761 (2000). "[T]he trial court's discretionary determination that the probative value of evidence is . . . outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) Id., 330. "Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates *undue* prejudice so that it threatens an injustice were it to be admitted. . . . [Accordingly] [t]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the [party against whom the evidence is offered] but whether it will improperly arouse the emotions of the jur[ors]." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 329–30.

---

[38] Indeed, the state does not seriously contest the fact that the proffered evidence was at least marginally relevant.

We acknowledge that evidence of an abortion, in certain circumstances, may give rise to a real risk of unfair prejudice because such evidence necessarily implicates a woman's sexual history and her highly personal decision to terminate a pregnancy. We conclude, however, under the circumstances of the present case, that the trial court improperly determined that the probative value of the evidence of the 1998 abortion was outweighed by the danger of unfair prejudice. Although the evidence of the 1998 abortion certainly would have been damaging to the state's case inasmuch as it had the effect of undermining the state's contention that the victim never would have agreed to abort her August, 1998 pregnancy, the mere fact that it was damaging to the state's case does not necessarily translate into *unfair* prejudice within the meaning of § 4-3 of the Connecticut Code of Evidence. See, e.g., Conn. Code Evid. § 4-3, commentary ("All evidence adverse to an opposing party is inherently prejudicial because it is damaging to that party's case. . . . For exclusion, however, the prejudice must be unfair in the sense that it unduly arouse[s] the [jurors'] emotions of prejudice, hostility or sympathy . . . ." [Citations omitted; internal quotation marks omitted.]). It is unlikely that the proffered evidence regarding the 1998 abortion would have "improperly arouse[d] the emotions of the jur[ors]"; *State* v. *Copas*, supra, 252 Conn. 330; in light of the victim's previous testimony that (1) she had had a long-standing sexual relationship with the defendant, (2) she previously had aborted an earlier pregnancy by the defendant, (3) she thereafter continued to have a sexual relationship with the defendant, and (4) she again had become pregnant by him. See, e.g., *State* v. *Baldwin*, 224 Conn. 347, 358, 618 A.2d 513 (1993) (noting that prejudicial effect of evidence is reduced when similar evidence already had been placed before jury). Furthermore, any possible prejudice could have been

minimized or even eliminated by an instruction cautioning the jury about the limited purpose of the evidence that defense counsel sought to present.

Beyond concerns of unfair prejudice, the trial court also found that the probative value of the evidence was outweighed by all of the other balancing factors set forth in § 4-3 of the Connecticut Code of Evidence, namely, the risk of unfair surprise, confusion of the issues, misleading the jury, and considerations of undue delay, waste of time and needless presentation of cumulative evidence. See footnote 34 of this opinion. We simply do not see how the evidence proffered by the defendant was likely to implicate any of these considerations. The proffered evidence was straightforward and limited in scope, and was not likely to have caused any undue delay, confusion or unfair surprise.

Although we conclude that the trial court abused it discretion in disallowing the proffered evidence, our inquiry is not at an end. Rather, we still must determine whether the impropriety is merely evidentiary in nature or whether it rises to the level of a constitutional violation. Cf. *State* v. *Cerreta*, supra, 260 Conn. 264. "Whether a trial court's erroneous restriction of a defendant's or defense [witness'] testimony in a criminal trial deprives a defendant of his [constitutional] right to present a defense is a question that must be resolved on a case by case basis." (Internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 178 n.25, 777 A.2d 604 (2001). The primary consideration in determining whether a trial court's ruling violated a defendant's right to present a defense is the centrality of the excluded evidence to the claim or claims raised by the defendant at trial. See *State* v. *Cerreta*, supra, 264.

In the present case, defense counsel sought to demonstrate that the state's evidence was not sufficiently strong to warrant a finding beyond a reasonable doubt

that the defendant surreptitiously had inserted the pills into the victim's vagina with the intent to terminate the victim's August, 1998 pregnancy. As we have indicated, the defendant maintains that the proffered evidence was important to his case because it tended to undermine the victim's explanation as to why she had refused to abort that pregnancy. We disagree with the defendant that the proffered evidence was central to his claim that, even if he had participated in the attempted abortion, he did so with the victim's knowledge and consent. Although the victim testified that her 1997 abortion was the product of a "poor choice" and that she would not make the same choice again, she never denied having a second abortion in 1998. In addition, there is nothing in the victim's testimony to indicate that her refusal to abort her August, 1998 pregnancy was affected only by her 1997 abortion and not by any subsequent abortion. In other words, there is no necessary implication to be drawn from the victim's testimony that her refusal to abort her August, 1998 pregnancy was not the product of *both* her 1997 abortion *and* the alleged 1998 abortion. Furthermore, there is nothing in the record to suggest that the victim's reaction to the 1997 abortion was the *only* reason for the victim's refusal to abort her August, 1998 pregnancy. Indeed, the evidence indicated that the victim's strong preference would have been not to abort her 1997 pregnancy either.[39] Finally, the victim never deviated from her testimony that she would not, and did not, agree to abort her August, 1998 pregnancy, and there is absolutely nothing in the record to suggest

[39] The victim testified that she also did not want to abort her 1997 pregnancy by the defendant but decided to do so, in part, because she believed that her daughter's father would not allow her daughter to emigrate to this country from Peru if the victim had a second child. When the victim learned that she was pregnant by the defendant in August, 1998, the victim's daughter already had joined her in this country. Consequently, in August, 1998, the victim was free to carry her pregnancy to term without any concern that her decision to do so would adversely affect her ability to be with her daughter.

otherwise. Thus, although the proffered evidence had some probative value and that probative value was not outweighed by the danger of unfair prejudice, the proffered evidence was not particularly important to the issues in the case. In such circumstances, the exclusion of the evidence clearly did not implicate the defendant's constitutional right to present a defense.[40]

In light of our conclusion that the court's decision to grant the state's motion to quash the subpoena and disallow defense counsel from offering the proffered evidence, although improper, was not an impropriety of constitutional dimension, the defendant bears the burden of demonstrating that the error was harmful. E.g., *State* v. *Young*, 258 Conn. 79, 94–95, 779 A.2d 112 (2001). "As we recently have noted, we have not been fully consistent in our articulation of the standard for establishing harm. . . . One line of cases states that the defendant must establish that it is more probable

[40] The defendant also contends that the trial court's ruling precluding his use of the proffered evidence violated his right under the confrontation clause to impeach the victim's testimony that she had had no other sexual partners during the four years that she was involved with the defendant. Although the fact that the victim had a sexual relationship with a man other than the defendant in 1998 was relevant on the issue of the victim's credibility in light of the victim's earlier testimony regarding her exclusive sexual relationship with the defendant, we conclude that any impropriety in connection with the trial court's decision to preclude defense counsel from examining the victim on the issue of the exclusivity of her sexual relationship with the defendant was evidentiary in nature and did not implicate the defendant's constitutional right to confrontation. Thus, the defendant bears the burden or proving harm as a result of this allegedly improper evidentiary ruling of a nonconstitutional nature. E.g., *State* v. *King*, 249 Conn. 645, 669 n.30, 735 A.2d 267 (1999). The fact on which defense counsel sought to impeach the victim, namely, the exclusivity of her sexual relationship with the defendant, was only marginally relevant to the primary issues in the case. Furthermore, as we conclude in the text of part II of this opinion, the evidence implicating the defendant in the crimes with which he was charged was strong. Consequently, there is no reasonable possibility that the defendant suffered any harm by virtue of defense counsel's inability to use the proffered evidence to impeach the victim's testimony that her relationship with the defendant was an exclusive one.

than not that the erroneous action of the court affected the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Citations omitted; internal quotation marks omitted.) Id., 95. For purposes of this case, we need not choose between the two formulations because we conclude that the defendant has not satisfied his burden of proving harm under either one.

As we have explained, the proffered evidence was not critical to the issues in the case; indeed, the evidence was no more than marginally or minimally significant. Moreover, defense counsel aggressively cross-examined the victim in an attempt to convey to the jury that any participation by the defendant in the attempted abortion was consensual and that the victim falsely had accused the defendant of seeking to abort the pregnancy against her will.[41] Furthermore, the evidence against the defendant was strong. The victim testified forcefully and unwaveringly about the details of the assault, and her version of the facts was buttressed by the testimony of Waitzman and Sanderson, who explained that the victim had reported the assault to them on the day that it occurred.[42] In addition, police discovered highly incriminating evidence at the defendant's residence, including several pills identical to those discovered in the victim's vagina. Under the circumstances, we conclude that the exclusion of the prof-

[41] Defense counsel elicited testimony from the victim that, when she learned that she had become pregnant by the defendant in August, 1998, she loved the defendant, trusted him and wanted to marry him. The victim also testified that she and the defendant never had spoken about marriage. Although the victim denied that she was upset that the defendant had not proposed marriage, defense counsel posited that fact as a possible motive for the victim's allegedly false accusation against him.

[42] The victim's version also was supported by Warga, with whom the victim spoke several days after the assaults had occurred.

fered evidence neither affected the result of the trial nor undermined confidence in the jury's verdict. Furthermore, the excluded evidence would have laid only a fragile foundation for the inference that the defendant sought the jury to draw from it. Specifically, that evidence indicated that the victim previously had another safe clinical abortion, in addition to the one she had in 1997. In light of that fact, it is counterintuitive to conclude that the victim, a medical assistant, voluntarily would have resorted to attempting to terminate a third pregnancy in any other manner, especially the manner in which the abortion in the present case was attempted. Indeed, the victim herself indicated in her testimony that she believed that a clinical abortion is much safer than attempting to terminate a pregnancy without proper medical supervision. Consequently, we conclude that the defendant cannot prevail on his second claim.

### III

The defendant next claims that the trial court improperly denied his motion for a judgment of acquittal notwithstanding the jury's verdict on the charges of attempt to commit aggravated sexual assault in the first degree in violation of §§ 53a-70a (a) (2) and 53a-49 (a) (2), and attempt to commit assault in the first degree in violation of §§ 53a-59 (a) (2) and 53a-49 (a) (2). Specifically, the defendant asserts that the state failed to prove, with respect to both of those charges, that the defendant had assaulted the victim with the "intent . . . to destroy . . . or disable permanently a member or organ of [her] body . . . ." General Statutes § 53a-70a (a) (2); accord General Statutes § 53a-59 (a) (2). We reject the defendant's contention.

The evidence adduced by the state established that the defendant sexually assaulted the victim for the purpose of aborting her pregnancy, without her knowledge or consent, by inserting into her vagina two pills, each

of which contained an abortifacient. According to the state, this evidence was sufficient to satisfy the requirement of §§ 53a-70a (a) (2) and 53a-59 (a) (2) that the defendant assault the victim with intent to destroy or disable permanently a member or organ of her body because, according to the state, the fetus that the defendant sought to abort constituted a "member" of the victim's body.[43] The defendant maintains a contrary view. Thus, the sole issue that we must decide in connection with the defendant's challenge to the sufficiency of the evidence in regard to his convictions under §§ 53a-70a (a) (2) and 53a-59 (a) (2) is whether the fetus was a "member" of the victim's body within the meaning of those statutory provisions.

Because our resolution of the defendant's claim requires the application of two statutory provisions, namely, §§ 53a-70a (a) (2) and 53a-59 (a) (2), to a particular factual scenario, our review is guided by well established principles of statutory interpretation, the fundamental objective of which is to ascertain the intent of the legislature. E.g., *Hartford Hospital* v. *Dept. of Consumer Protection*, 243 Conn. 709, 715, 707 A.2d 713 (1998). To discern that intent, we look first to the pertinent statutory language, mindful of the fact that "[c]riminal statutes are not to be read more broadly than their language plainly requires . . . . Moreover, [a] penal statute must be construed strictly against the state and liberally in favor of the accused. . . . [A]mbiguities are ordinarily to be resolved in favor of the defendant. . . . In the interpretation of statutory provisions [however] the application of common sense to the language is not to be excluded. . . . Thus, [e]ven applying the view that a penal statute should be strictly construed, the words of a statute are to be construed

---

[43] The state concedes on appeal, as it did at trial, that a fetus is not an "organ" within the meaning of §§ 53a-70a (a) (2) and 53a-59 (a) (2).

with common sense and according to the commonly approved usage of the language." (Citations omitted; internal quotation marks omitted.) *State* v. *Love*, 246 Conn. 402, 412 n.13, 717 A.2d 670 (1998).

As we have indicated, our determination of the issue presented depends upon the meaning of the word "member," a term that is not defined in § 53a-70a or § 53a-59, or anywhere else in the Penal Code. In the absence of a statutory definition, words and phrases in a particular statute are to be construed according to their common usage. E.g., *Verna* v. *Commissioner of Revenue Services*, 261 Conn. 102, 109–10, 801 A.2d 769 (2002); see General Statutes § 1-1 (a).[44] To ascertain that usage, we look to the dictionary definition of the term. E.g., *State* v. *Rivera*, 250 Conn. 188, 200 n.12, 736 A.2d 790 (1999). In the present case, both the defendant and the state agree that, for purposes of each of the two statutory provisions at issue, the term "member" means "a bodily part or organ."[45] Inasmuch as the parties also agree that a fetus is not an organ, we must determine whether a fetus is a bodily "part." Webster's Third New International Dictionary defines the term "part" as "one of the equal or unequal portions into which something is or is regarded as divided: something less than a whole: a unit (as a number, quantity, or mass) held to constitute with one or more other units something larger: constituent, fraction, fragment, member, piece . . . ."

[44] General Statutes § 1-1 (a) provides: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly."

[45] The term "member" is so defined in Webster's Third New International Dictionary.

We are persuaded that a five week old[46] fetus[47] constitutes a part of the mother's body and, therefore, is a "member" of her body within the meaning of §§ 53a-70a (a) (2) and 53a-59 (a) (2). First, as with any bodily part, a fetus constitutes physically identifiable tissue. Second, implantation of the fetus occurs within the mother's uterus, and the fetus is attached to the mother via the umbilical cord and placenta. See, e.g., A. Guyton & J. Hall, Textbook of Medical Physiology (10th Ed. 2002) pp. 945–46. Finally, the fetus is nourished and sustained by the mother; indeed, at five weeks of age, the fetus is incapable of survival outside the mother.

Furthermore, because "[t]he law favors rational and sensible statutory construction"; (internal quotation marks omitted) *Connelly* v. *Commissioner of Correction*, 258 Conn. 394, 407, 780 A.2d 903 (2001); we interpret statutes to avoid bizarre or nonsensical results. See, e.g., *Southington* v. *Commercial Union Ins. Co.*, 254 Conn. 348, 360, 757 A.2d 549 (2000). "[I]f two constructions of a statute are possible, we will adopt the one that makes the statute effective and workable." (Internal quotation marks omitted.) *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 157, 788 A.2d 1158

---

[46] Testimony adduced at trial indicated that the victim was approximately five weeks pregnant when the defendant inserted the Cytotec pills into her vagina. For ease of reference, we refer to the victim's fetus as a five week old fetus even though fertilization likely would have occurred less than five weeks prior to the incidents that gave rise to the charges in this case. See Gray's Anatomy (38th Ed. 1995) p. 344 ("[t]o estimate the length of a pregnancy . . . the commencement of gestation is traditionally determined clinically by counting from the date of the last menstrual period," which invariably occurs prior to fertilization).

[47] We recognize that, in humans, a fetus is "the product of conception from the end of the eighth week [after fertilization] to the moment of birth"; Stedman's Medical Dictionary (27th Ed. 2000) p. 658; whereas an embryo is "the developing organism from conception until approximately the end of the second month . . . ." Id., p. 581. For purposes of this case, however, we refer to the victim's unborn child as a fetus because the parties have done so.

(2002). In light of the state's compelling interest in safeguarding life and limb, we are unwilling to presume that the legislature, in enacting §§ 53a-70a (a) (2) and 53a-59 (a) (2), sought to protect a person's ear, tongue and skin but not a developing fetus living within, and physically attached to, the mother. Moreover, to conclude otherwise would not only yield an untenable result but would require us to ignore the policy that those statutory provisions were designed to implement, a result that is inconsistent with our duty to give voice to the legislative intent underlying those provisions.[48] See, e.g., *Cimochowski* v. *Hartford Public Schools*, 261 Conn. 287, 299–303, 802 A.2d 800 (2002); *Hartford Courant Co.* v. *Freedom of Information Commission*, 261 Conn. 86, 99, 101, 801 A.2d 759 (2002).

The defendant contends that, because a fetus is attached to a part of the mother's body that is shed routinely every month as part of menstruation, namely, the endometrial lining of the uterus, the fetus cannot be considered a "member" of the mother's body. We are not persuaded by this argument, for other bodily parts that fall within the purview of §§ 53a-70a (a) (2) and 53a-59 (a) (2), such as deciduous teeth,[49] skin and hair, also are shed by the body. Furthermore, the endometrial lining of the uterus is not shed during pregnancy. See A. Guyton & J. Hall, supra, p. 937. Thus, the mere fact that a fetus is not a *permanent* part of the mother's body does not lead to the conclusion that it is not a part of her body, within the meaning of those two statutory provisions, for the period of time that it is attached to

[48] We note that neither party has provided us with any legislative history, and we are aware of none, that casts light on whether a fetus constitutes a member of the mother's body for purposes of §§ 53a-70a (a) (2) and 53a-59 (a) (2).

[49] Commonly referred to as baby teeth, deciduous teeth are the teeth that appear during infancy and that are shed between the ages of six and thirteen. See Mosby's Medical, Nursing and Allied Health Dictionary (6th Ed. 2002) pp. 481–82.

and dependent upon the mother. See *St. Clair* v. *State*, 26 S.W.3d 89, 101 (Tex. App. 2000) (petition for discretionary review refused, Tex. Crim. App. December 20, 2000) (unborn child constitutes " 'bodily member' of the mother until birth").

We conclude, therefore, that the fetus was a "member" of the victim's body for purposes of §§ 53a-70a (a) (2) and 53a-59 (a) (2). We therefore reject the defendant's contention that the trial court improperly denied his motion for a judgment of acquittal.

## IV

The defendant's final claim is that the trial court improperly instructed the jury to disregard testimony that the victim had applied to the state office of victim services for compensation. In particular, he contends that this instruction undermined his claim that the victim's complaint against him was motivated by considerations of financial gain and not by any misconduct on the part of the defendant. We reject this contention.

As we previously have explained; see part I of this opinion; defense counsel elicited testimony from the victim on cross-examination that she had filed a claim for compensation with the office of victim services.[50] In its charge to the jury at the conclusion of the case, however, the trial court, after briefly explaining this state's compensation program for victims, instructed the jury as follows: "The fact that there was or was not a claim [for compensation], as well as the fact that a claim was or was not paid, is not important to your determination here, and has no bearing upon the decisions that you must make today." Defense counsel objected to this particular instruction, stating: "I object to the court's instruction on the victim's compensation

---

[50] See General Statutes § 54-201 et seq. The maximum compensation for which the victim in the present case is eligible is $15,000. See General Statutes § 54-211 (d).

act. I construe that to be adding evidence to the case." Defense counsel did not further elaborate on the basis of his objection.

On appeal, the defendant challenges the propriety of the court's instruction on the ground that he was entitled to have the jury consider the fact that the victim had applied for compensation from the office of victim services. In particular, the defendant contends that the evidence supported a claim that the victim lodged a false complaint against him solely to make herself eligible for such compensation. The state maintains that the defendant is not entitled to appellate review of his claim because he failed to raise that specific claim at trial. We agree with the state.

"Appellate review of evidentiary rulings is ordinarily limited to the specific legal [ground] raised by the objection of trial counsel. . . . The purpose of requiring trial counsel to object properly is not merely formal: it serves to alert the trial court to purported error while there is time to correct it without ordering a retrial." (Citation omitted.) *State* v. *Christiano*, 228 Conn. 456, 464, 637 A.2d 382, cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994). "To permit a party to raise a different ground on appeal than [that] raised during trial would amount to trial by ambuscade, unfair both to the trial court and to the opposing party." (Internal quotation marks omitted.) *State* v. *Colton*, 227 Conn. 231, 255 n.22, 630 A.2d 577 (1993). Inasmuch as the defendant raises a claim on appeal different from the one that he raised at trial, he is not entitled to review of his claim.

Even if the defendant properly had preserved his claim, however, the claim would fail. Even if we assume, arguendo, that the challenged instruction was improper, there is no reasonable likelihood that it prejudiced the defendant in view of the fact that the victim lodged her complaint against the defendant on August 10, 1998, a

full week before she was notified of her right to seek compensation from the office of victim services. In the absence of any indication that the victim was aware that she could seek payment from the office of victim services when she filed her complaint against the defendant, there is no reasonable likelihood that the jury would have been persuaded by a claim that the victim fabricated her allegations against the defendant for the purpose of obtaining statutorily authorized compensation.

The judgment is affirmed.

In this opinion BORDEN, VERTEFEUILLE and ZARELLA, Js., concurred.

---

SULLIVAN, C. J., concurring. I concur in the judgment and agree with the majority's reasoning with regard to parts I, II and IV. In addition, with respect to part III of the majority opinion, I agree that the trial court properly rejected the motion of the defendant, Edwin Sandoval, for judgment of acquittal on the charges of attempt to commit aggravated sexual assault in the first degree and attempt to commit assault in the first degree. Specifically, I agree with the majority's conclusion that the jury reasonably could have concluded that the defendant attempted to assault the victim with the intent to "destroy . . . or disable permanently a member . . . of [her] body," because a five week old fetus is a "member" of the victim's body for purposes of General Statutes §§ 53a-59 (a) (2) and 53a-70a (a) (2).

I write separately only to emphasize that the mere fact that we have determined that a fetus, under the circumstances of this case, is a "member" of a woman's body for purposes of §§ 53a-59 (a) (2) and 53a-70a (a) (2) does not suggest that either the majority or I have concluded that a fetus may not have its own independent existence. In other words, the fetus may both be

a part of its mother as well as its own individual being. Indeed, this property is among the unique characteristics of a fetus that make it truly sui generis. The fact that a fetus has exceptional attributes that may entitle it to legal protections in its own right, however, does not mean that a fetus is not also a member of a woman's body. Therefore, I agree with the majority that, under the circumstances of this case, the fetus is a member of a woman's body. Accordingly, I concur.