SHARON RAUDAT *v.* DENISE LEARY
(AC 24491)

West, DiPentima and McLachlan, Js.

Argued October 28, 2004—officially released March 15, 2005

*William H. Cashman,* for the appellant-appellee (defendant).

*Trisha Morris Porto,* with whom, on the brief, was *Ira B. Grudberg,* for the appellee-appellant (plaintiff).

*Opinion*

DiPENTIMA, J. These appeals involve the sale of a horse named Darryl. The defendant, Denise Leary, appeals from the judgment of the trial court in favor of the plaintiff, Sharon Raudat, after a trial to the court. On appeal, the defendant claims that the court (1) abused its discretion by allowing an admitted expert to give lay opinion, (2) lacked a proper evidentiary foundation on which to award damages and (3) made contradictory findings of fact in its decision. The plaintiff cross appeals, claiming that the court abused its

discretion by not awarding her consequential damages. We reverse the judgment of the trial court.

These appeals originate in the fields of Wallingford, where Darryl daily grazed. The defendant, who owned Darryl, placed an advertisement in early 2001, which indicated that Darryl was for sale. Jennifer Sisk responded to the advertisement in February and visited the defendant's barn, where she met with the defendant. During their conversation, the defendant informed Sisk that "[Darryl] was known to buck." Sisk was pregnant at the time. The defendant's farrier[1] testified at trial that the defendant told him that she had refused to sell Darryl to a pregnant purchaser due to his tendency to buck.

Thereafter, the defendant placed an advertisement in the June, 2001 edition of "Steed Read," an equine publication. The advertisement stated in relevant part: "Wallingford, CT. . . . Registered Appaloosa gelding 15.3 hand, green broke, 6 year old excellent ground manners. Ties, clips, trailers. Needs miles. $3,200 negotiable . . . ." In response, the plaintiff contacted the defendant. Although the defendant cautioned the plaintiff that Darryl was "green broke"[2] and "needed some miles," she also indicated that he would "make a great trail horse." The defendant never informed the plaintiff of Darryl's propensity to buck. When the plaintiff later visited the barn to inspect Darryl, the defendant again made no mention of his bucking proclivity.

On June 15, 2001, the plaintiff purchased Darryl from the defendant for $2800. She first exercised Darryl, lung-

[1] A farrier is "a person who shoes horses." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993).

[2] "Green broke" is a term of art in the horse business. A green broke horse is one that is "incompletely broken or trained." Webster's Third New International Dictionary (1961); see also *Nickell* v. *Sumner*, 943 P.2d 625, 626–27 (Okla. 1997) (" 'green broke' refers to a horse that accepts a saddle, can be ridden, but is not fully trained and may require special care before being mounted").

ing[3] him for a week. When she attempted to ride the horse, Darryl immediately bucked, tossing the plaintiff to the ground. As a result, she was knocked unconscious. The plaintiff testified that, at that moment, Darryl "went ballistic" and "bucked like he'd never been ridden before." The plaintiff therefore hired Pamela Pruitt, a horse trainer, to work with Darryl. After a month of work, Pruitt began riding the horse. She did so without incident for three weeks, until Darryl first threw her. On that occasion, Pruitt was "catapulted up about four feet" over the horse. Approximately five weeks later, Darryl did the exact same thing to Pruitt that he had done to the plaintiff, tossing her almost six feet in the air.[4] Pruitt this time was knocked unconscious when she hit the ground. Unable to ride the horse, the plaintiff sold Darryl to a third party on September 13, 2001, for $200. The bill of sale indicated that it was for "a 6 year [old Appaloosa] gelding that bucks . . . ." This litigation followed.

The plaintiff filed a two count complaint against the defendant on April 30, 2002, alleging both intentional and negligent misrepresentation in the sale of Darryl. Following a trial to the court, the court ruled in favor of the plaintiff, concluding that the defendant failed "to disclose a material fact that the horse bucked and, having made such a statement, would have resulted in no sale to [the plaintiff]." Because it had ruled in favor of

[3] Lunging is "[t]he act of exercising or training a horse by making it move in a circle around the handler who holds a long lunge line attached to the horse's halter (or other headpiece)." A Tadlock, The Ultimate Horse Dictionary, at http://www.ultimatehorsesite.com/dictionary/dictionary.html (2005).

[4] Pruitt's encounters with Darryl call to mind Shakespeare's Dauphin in *Henry V*, who describes his horse's readiness for battle: "He bounds from the earth, as if his entrails were hairs; le cheval volant, the Pegasus, qui a les narines de feu! When I bestride him, I soar, I am a hawk: he trots the air; the earth sings when he touches it . . . ." W. Shakespeare, Henry V, act 3, sc. 7.

the plaintiff on the intentional misrepresentation count, the court stated that it "does not need to address the second count of the complaint as to negligent misrepresentation." The court awarded the plaintiff $2600 in damages. From that judgment the parties appeal.

I

Before addressing the parties' respective claims on appeal, we first must consider the threshold question of whether this court lacks subject matter jurisdiction to hear these appeals. "Jurisdiction of the subject-matter is the power [of the court] to hear and determine cases of the general class to which the proceedings in question belong." (Internal quotation marks omitted.) *Esposito* v. *Specyalski*, 268 Conn. 336, 348, 844 A.2d 211 (2004). "A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Doe* v. *Roe*, 246 Conn. 652, 660, 717 A.2d 706 (1998). "Where a decision as to whether a court has subject matter jurisdiction is required, every presumption favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *Stewart-Brownstein* v. *Casey*, 53 Conn. App. 84, 88, 728 A.2d 1130 (1999).

The judgment file in the present case is entitled "Partial Judgment." During oral argument, we inquired as to whether these appeals were brought from a final judgment and subsequently ordered the parties to file supplemental briefs on that issue. "The lack of a final judgment implicates the authority of this court to hear the appeal because it is a jurisdictional defect." (Internal quotation marks omitted.) *Cruz* v. *Gonzalez*, 40 Conn. App. 33, 35, 668 A.2d 739 (1995).

We conclude that, despite the particular nomenclature of the judgment file, a final judgment exists in this case. The plaintiff's complaint contained two counts that alleged intentional and negligent misrepresentation. Our Supreme Court recently observed that "the same conduct [cannot] reasonably be determined to have been both intentionally and negligently tortious. . . . [I]ntentional conduct and negligent conduct, although differing only by a matter of degree . . . are separate and mutually exclusive. . . . Although in a given case there may be doubt about whether one acted intentionally or negligently, the difference in meaning is clear." (Citations omitted; internal quotation marks omitted.) *DaCruz* v. *State Farm Fire & Casualty Co.*, 268 Conn. 675, 693, 846 A.2d 849 (2004). It is for that reason that the court, in its memorandum of decision, concluded that it did "not need to address the second count of the complaint as to negligent misrepresentation" once it had concluded that the defendant was liable for intentional misrepresentation. That language appears again in the judgment file.

As noted by former Chief Justice Ellen Peters, "Although it is preferable for a trial court to make a formal ruling on each count, we will not elevate form over substance when it is apparent from the memorandum of decision that the trial court [found that a negligent misrepresentation had not been made]." *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, 230 Conn. 486, 488 n.1, 646 A.2d 1289 (1994). As did the court in *Normand Josef Enterprises, Inc.*, we thus determine that the rights of the parties were concluded and that a final judgment was rendered in this case.

## II

The defendant claims that the court abused its discretion by admitting expert testimony disguised as lay opinion. Specifically, she claims that Pruitt's expert opinion

as to whether Darryl was green broke was improperly admitted. "[W]e will set aside an evidentiary ruling only when there has been a clear abuse of discretion." (Internal quotation marks omitted.) *Kalams* v. *Giacchetto*, 268 Conn. 244, 249, 842 A.2d 1100 (2004). "[B]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, [it] has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result." (Internal quotation marks omitted.) *Urich* v. *Fish*, 261 Conn. 575, 580–81, 804 A.2d 795 (2002).

During trial, Pruitt testified on behalf of the plaintiff. When Pruitt was asked whether Darryl was green broke, the defendant objected. Sustaining the objection, the court stated, "I'll let [Pruitt] testify as to what the term means, but I'm not going to have her give an opinion as to whether this horse was green broke. If you wanted to bring her as an expert in this case, you should have disclosed it." Later in Pruitt's testimony, the court reversed course. As it explained: "[The court] is going to allow her to testify after her experience with this horse . . . . And then the question was asked [of] her whether or not it was a green horse based on her understanding of what a green horse means, and I'll allow the question." The court concluded that such testimony "would not be an expert opinion," but rather was "lay opinion as to whether or not . . . the horse was a green horse." Pruitt then opined that Darryl was a green broke horse.

The question before us is whether that opinion constitutes expert testimony. Expert testimony is required when a disputed matter is "manifestly beyond the ken of the average trier of fact, be it judge or jury." *State* v. *McClary*, 207 Conn. 233, 245, 541 A.2d 96 (1988); see also *Jaffe* v. *Dept. of Health*, 135 Conn. 339, 349, 64 A.2d 330 (1949) ("where . . . an issue presented is such that

its solution can only be reached upon the basis of the special knowledge of expert witnesses, such evidence must be produced"). At trial, the court conceded that it had no idea what the term green broke meant. After the defendant testified that Darryl was green broke, the following colloquy occurred between the defendant and the court:

"The Court: And was what?

"[The Defendant]: Green broke.

"The Court: Green broke?

"[The Defendant]: Yeah.

"The Court: That's an expression?

"[The Defendant]: That's—yeah. That's what they call them.

"The Court: You know, I'm not a horse man. I don't even bet on them, don't go to the track, so when you— explain what a green broke horse is, please."

By the court's own admission, a disputed matter in this case—whether Darryl was green broke—was beyond the ken of the trier of fact. For that reason, expert testimony was required. When the court therefore admitted Pruitt's testimony on that issue as lay opinion, it abused its discretion. "[L]ay opinion testimony is limited to testimony based on the perception of fleeting events that does not require the witness to apply specialized knowledge. Application of specialized knowledge from whatever source would bring the testimony within the sphere of expertise." D. Kaye, D. Bernstein & J. Mnookin, The New Wigmore: Expert Evidence (2004) § 1.7, p. 40.

Practice Book § 13-4 (4)[5] requires disclosure of expert witnesses prior to trial. Pruitt began her testimony with a discussion of her expert qualifications. Pruitt testified that she was an equine trainer and had a training farm. She had trained horses for more than thirty-seven years, including "ten to twelve top ten world champion horses . . . ." Pruitt also was a member of the United States equestrian team, through which she participated in international competitions and "won the gold . . . ." Furthermore, Pruitt described herself as "[a] professional trainer" and rated herself a "nine" on a scale of one to ten as an expert. In light of her expert qualifications and opinion testimony at trial, the plaintiff was required to disclose Pruitt as an expert witness prior to trial, as mandated by our rules of practice.[6] It is undisputed that there was no such disclosure. Pruitt testified as to the central issue at trial—whether Darryl was green broke. Because that opinion testimony likely

---

[5] Practice Book § 13-4 (4) provides in relevant part: "[A]ny plaintiff expecting to call an expert witness at trial shall disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, to all other parties within a reasonable time prior to trial. Each defendant shall disclose the names of his or her experts in like manner within a reasonable time from the date the plaintiff discloses experts, or, if the plaintiff fails to disclose experts, within a reasonable time prior to trial. If disclosure of the name of any expert expected to testify at trial is not made in accordance with this subdivision, or if an expert witness who is expected to testify is retained or specially employed after a reasonable time prior to trial, such expert shall not testify if, upon motion to preclude such testimony, the judicial authority determines that the late disclosure (A) will cause undue prejudice to the moving party; or (B) will cause undue interference with the orderly progress of trial in the case; or (C) involved bad faith delay of disclosure by the disclosing party. . . ."

[6] The plaintiff argues that Pruitt merely was a lay witness and that her lay opinion testimony was permitted by § 7-1 of the Connecticut Code of Evidence. The plaintiff's examination of Pruitt and Pruitt's specialized knowledge, however, belie the plaintiff's attempt to cloak her testimony in the guise of lay testimony. Moreover, the predicate for application of the exception contained in § 7-1 is the testimony of a witness who is not an expert. Conn. Code Evid. § 7-1, commentary. That section is therefore inapplicable.

affected the final result, its admission cannot be considered harmless. See *Higgins* v. *Karp*, 243 Conn. 495, 506–507, 706 A.2d 1 (1998).

We conclude that the court abused its discretion in admitting Pruitt's testimony as to whether Darryl was green broke. Accordingly, we reverse the judgment of the trial court and remand the case for a new trial. In light of our resolution of this issue, we need not reach the remaining issues on appeal, nor do we reach the defendant's cross appeal.

On the defendant's appeal, the judgment is reversed and the case is remanded for a new trial. The cross appeal is dismissed.

In this opinion the other judges concurred.