STATE OF CONNECTICUT *v.* RICHARD W. STRICH
(AC 27371)

DiPentima, Lavine and Peters, Js.

Argued November 15, 2006—officially released February 20, 2007

*Jon L. Schoenhorn,* with whom, on the brief, was *Jennifer L. Bourn,* for the appellant (defendant).

*Sarah Hanna,* special deputy assistant state's attorney, with whom, on the brief, were *Kevin D. Lawlor,* state's attorney, and *Mary M. Galvin,* former state's attorney, for the appellee (state).

*Opinion*

PETERS, J. In this criminal appeal, the defendant challenges the validity of his conviction of attempt to commit murder and other crimes relating to his shooting of his estranged wife. His principal claims are that the trial court deprived him of his constitutional right to a fair trial by responding inappropriately to his disruptive courtroom behavior and by limiting his opportunity to present evidence of his mental state when he committed the crimes. Because we find none of his claims of error persuasive, we affirm the judgment of the trial court.

In a multicount amended substitute information, the state charged the defendant, Richard W. Strich, with the crimes of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) and 53a-54a (a), assault in the first degree in violation of General Statutes § 53a-59 (a) (1), burglary in the first degree in violation of General Statutes § 53a-101 (a) (1), criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (5), carrying a pistol without a permit in violation of General Statutes § 29-35 (a) and possession of weapons in a motor vehicle in violation of General Statutes § 29-38. The defendant pleaded not guilty. After accepting the verdict of the jury finding the defendant guilty of these charges, the trial court imposed a total

effective sentence of forty years incarceration. The defendant has appealed.

The jury reasonably could have found the following facts, which were essentially undisputed. Early in August, 2002, the defendant's wife, Sandra Kopaz Strich (Kopaz), decided to end her long marriage to the defendant. She moved into the Milford home of her sister, Diane Visconti, and her sister's ex-husband, Edward Visconti. The Viscontis thereupon posted "no trespassing" signs outside their home. On August 6, 2002, Kopaz and the Viscontis obtained a temporary restraining order for their protection from the defendant.

On August 8, 2002, in response to timely notification of the temporary restraining order, the defendant went to the Milford police department to surrender his pistol permit and a .357 magnum handgun. Although he was asked whether he owned other guns, he did not turn in other weapons that he had in his possession, such as his shotgun or another handgun.

On August 20, 2002, after a hearing, a full restraining order was issued for the protection of Kopaz and the Viscontis.[1] That same day, the defendant was served with papers for the dissolution of his marriage to Kopaz.

On August 28, 2002, the defendant repeatedly attempted to contact Kopaz at her workplace to tell her, falsely, that he had been shot and hospitalized.[2] When she refused to talk to him, he drove to the parking lot of the company where she worked in an attempt to confront her there. In his vehicle, he had a number of weapons, including a loaded shotgun.

---

[1] Although the defendant also obtained a temporary restraining order against Kopaz, alleging that she had threatened his life, the permanent restraining order was addressed only to the defendant.

[2] He also tried, unsuccessfully, to enlist a neighbor to convey this false message.

Having missed Kopaz at the parking lot, the defendant drove to the Visconti residence, pushed his way in and asked her to leave with him. As she was trying to escape from him, he shot her with his shotgun. As a result of the shooting, her back and shoulder area was seriously and permanently injured.

The defendant then drove away from the Visconti residence. On his way toward Milford center, he was stopped by Milford police officers because he had been observed loading a shotgun in his vehicle and driving erratically. For an extended period, the defendant threatened to kill himself with his handgun, but the gun did not fire because he had not chambered a round. He also threatened to light a gasoline can to blow himself up. After a five hour standoff, the defendant requested coffee, which the police laced with a sedative. He was subdued and taken into custody. When the police searched the defendant's vehicle after his arrest, they found a loaded shotgun, a loaded handgun, an axe, a machete, a carpentry belt and a pocketknife.

At trial, the defendant did not deny that he had committed the acts charged in the information against him. His defense was that, distressed about the dissolution of his marriage, he had shot Kopaz accidentally and unintentionally. The jury heard conflicting evidence about the defendant's state of mind. Although the defendant testified that he loved Kopaz and wanted to reconcile, a neighbor testified that, before the shooting, the defendant had told him that he had thoughts of killing her. A police officer testified to having heard the defendant say, after the shooting, that he had worked hard for many years to build up the family's estate and that they would either reconcile "or they were both going to die." In addition, to impeach the defendant's credibility, the state introduced into evidence threatening letters he had sent to Kopaz.

On appeal, the defendant does not challenge the sufficiency of the evidence supporting the jury's rejection of his defense. He maintains instead that the trial court (1) deprived him of his constitutional right to be present in the courtroom, (2) impaired his constitutional right to defend himself by excluding evidence about his state of mind, (3) interfered with his right of allocution at sentencing and (4) improperly included the Viscontis in the posttrial criminal restraining order against him. We disagree.

I

## PRESENCE IN THE COURTROOM

Although the trial court warned the defendant on numerous occasions that he would be removed from the courtroom if he continued to violate orders of the court, the court did not order the defendant's removal until he disrupted the proceedings at the beginning of the prosecutor's closing argument to the jury. The defendant loudly challenged the prosecutor's sexual orientation and claimed that the prosecutor had no right to prosecute the case against him. After a further unsatisfactory conversation with the defendant, the court ordered his removal from the courtroom for the remaining closing argument, for the jury instructions and for the jury verdict. The defendant claims that he is entitled to a new trial because his removal was unconstitutional. We disagree.

The defendant raises four issues with respect to his removal. He maintains that (1) his conduct was not sufficiently disruptive to warrant his removal, (2) he was removed in an improper manner, (3) the jury was not properly instructed to disregard his disruptive conduct and (4) he was not expressly informed of his right to return to the courtroom if he agreed to obey the court's orders. Because none of these issues was raised at trial, the defendant argues that the trial court violated

constitutional rights that entitle him to appellate review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).

The defendant's first claim does not need discussion. Although he had raised it in his brief, appellate counsel properly conceded, at oral argument in this court, that the defendant's outburst was disruptive. The record amply demonstrates a pattern of disruptive behavior.[3] Indeed, at trial, the defendant's counsel immediately apologized for the defendant's conduct.

The defendant's second claim is that he was removed from the courtroom in an improper manner. He complains that, without waiting for an order from the trial court, and in the presence of the jury, court marshals improperly removed him from the courtroom. This claim borders on the frivolous.

The record shows that, upon hearing the defendant's outburst, the court immediately excused the jury and then ordered the defendant to be returned to the courtroom. Having no reason to anticipate the defendant's disruptive conduct, the court could not have acted more expeditiously than it did.

The court then engaged in a colloquy with the defendant in which the defendant declined to commit himself to listening quietly to the proceedings as they went forward.[4] Only after a further conference with counsel,

---

[3] The defendant made inappropriate comments during the voir dire process, during discussion of his telephone privileges, during the testimony of Diane Visconti and during his own testimony. He does not deny that he repeatedly was warned that continuation of his interjections would lead to his removal from the courtroom.

[4] When the defendant returned to the courtroom, the following colloquy ensued:

"The Defendant: Is this a fair trial, ladies and gentlemen? Is this America justice to you? All right. Is this an example of our American justice system? You're surely not living in a free country.

"The Court: Mr. Strich, sir, I'm going to give you two choices. You can either continue to remain in the courtroom and continue to observe the proceedings. If you're going to be disruptive, sir, I will—

off the record, and further evidence of untoward statements on the part of the defendant[5] was the defendant ordered removed from the courtroom for the remaining proceedings. The defendant was able thereafter to hear these proceedings in a holding cell that was equipped

"The Defendant: I was telling the truth, Your Honor. I wasn't being disruptive.

"The Court:—again, sir, are you going to sit here and listen to the proceedings, or do I have to remove you from the courtroom?

"The Defendant: Only if I can sit here like a normal human being without these manacles on.

"The Court: Again, sir, listen to my question. Are you capable, do you think, of sitting here and listening to the proceedings as we go forward?

"The Defendant: I'm here as cocounsel with my attorney. We've had three prosecutors—we've sat and listened to three prosecutors up against my one attorney. That is not a fair trial, Your Honor.

"The Court: We going to take a very brief recess. Can I see counsel in chambers, please?

"(Whereupon the court recessed)"

[5] When the defendant reentered the courtroom, the following colloquy ensued:

"The Defendant: Hey, watch the merchandise, will you buddy? God. Got the clubs, too?

"The Court: Mr. Strich, if I could have your attention, sir, for just a moment? We are going to continue with these proceedings, sir, without you. You are going to be removed to the holding area. I am concerned that there will be continued disruptions here. I have noted in the proceedings so far this morning—

"The Defendant: I believe that's against my constitutional rights, Your Honor.

"The Court:—well, again, sir, let me finish. And then if you want to make a comment, you can. Again, I've noticed, sir, not only the outbursts that just occurred a few moments ago, but there's also—

"The Defendant: It was only the truth, Your Honor.

"The Court:—there's also—sir, let me finish.

"The Defendant: Um-hum.

"The Court: There's been commentary and gestures made to other members—other people who are here—

"The Defendant: Because the truth hurts. They can't look me in the eye.

"The Court:—so based on all that, sir, we're going to proceed without you. Take him out.

"The Defendant: John, would you take care of my legal work, please? We just had a man killed in Garner a couple of days ago.

"(Whereupon the court marshals escorted the defendant from the courtroom)"

with a speaker system. We can find no flaw, constitutional or otherwise, in the manner in which the trial court proceeded to address the defendant's outburst.

The defendant's third claim is that the court misinstructed the jury with respect to the defendant's removal. Promptly upon the jury's return to the courtroom, the court informed the jury that the state would present its final argument in the absence of the defendant. The court then instructed the jury that what it had just observed was not evidence and was not to be considered by the jury in any way whatsoever. In making its decision, the court said, the jurors would have to put what they had observed out of their minds and would have to focus on the testimony that had been presented under oath and on the exhibits that had been admitted. "Other things," the court instructed the jury, "are not evidence."[6]

The defendant faults this instruction for failing to inform the jury to disregard his untoward behavior, as distinguished from his inappropriate statements. He cites Practice Book § 42-47, which provides in relevant part that, when a defendant is removed from the courtroom, "the judicial authority shall instruct the jurors that such removal is not to be considered in assessing the evidence or in the determination of the case."[7]

---

[6] The court instructed the jury: "The other thing I want to be very careful for you to understand is that none of the statements that you heard here this morning by the defendant are evidence. As I've explained to you, any statement, except under oath, are not evidence, are not to be considered by you in anyway at all, *nor any other matters that you may have observed* here this morning. That's not evidence. Again, you need to focus with respect to the decision you make in this case on the evidence that was presented by the testimony that was under oath and the full exhibits that have been admitted. *Other things are not evidence.* And as I told you earlier, there is a portion of your mind where you need to put these things in the area that I call 'non-evidence.' I know it's difficult to psychologically separate those things, but you have to do best—to the best of your ability to do that separation." (Emphasis added.)

[7] Practice Book § 42-47, in its entirety, provides: "Upon the direction of the judicial authority, a defendant may be removed from the courtroom

In our view, in the absence of a timely exception, the court's instruction was sufficient to comply with the rules of practice. We find it significant that the court not only warned the jury that the defendant's statements were not evidence, but also cautioned the jurors not to consider "matters" that they might "have observed." Even when our rules of practice implement constitutional rights, our Supreme Court has not required literal compliance with its provisions. See, e.g., *State* v. *D'Antonio*, 274 Conn. 658, 709–14, 877 A.2d 696 (2005) (allowing defendant to proceed pro se); *State* v. *Ocasio*, 253 Conn. 375, 378–80, 751 A.2d 825 (2000) (acceptance of guilty plea). These precedents govern this case.

The defendant's fourth and final claim with respect to his removal relates to his constitutional right to be informed, after his removal, of his right to return to the courtroom if he agreed not to engage in further disruptive conduct. *Illinois* v. *Allen*, 397 U.S. 337, 338, 346, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970); *Sekou* v. *Warden*, 216 Conn. 678, 695–96, 583 A.2d 1277 (1990); Practice Book § 42-47.[8] It is undisputed that the court never informed the defendant that, with proper assurances, he could reclaim his right to be present for the remaining courtroom proceedings.

We must decide whether the court's oversight was harmless error. The defendant claims that, as a matter

---

during trial or hearing when the defendant's conduct has become so disruptive that the trial or hearing cannot proceed in an orderly manner. The judicial authority shall advise the defendant that the trial or hearing will continue in the defendant's absence. A defendant who has been removed shall remain present in the court building while the trial or hearing is in progress. At the time of the defendant's removal, the judicial authority shall advise the defendant that the defendant may request to be returned to the courtroom if, at the time of making such request, the defendant assures the judicial authority that the defendant shall not engage in disruptive conduct. Whenever the defendant is removed, the judicial authority shall instruct the jurors that such removal is not to be considered in assessing the evidence or in the determination of the case."

[8] See footnote 7.

of law, a court's impairment of his federally guaranteed constitutional right of presence is a structural error that requires automatic reversal of his conviction.[9] In the alternative, he claims that his removal, under the circumstances of this case, was not harmless beyond a reasonable doubt.[10] We are not persuaded of either claim.

As have other courts around the country that have addressed issues arising out of the right of presence, we hold that a new trial is not required if the state can establish the harmlessness of the court's error beyond a reasonable doubt. The United States Supreme Court addressed this issue in a case in which a trial judge concededly had violated a criminal defendant's right to be present during all critical stages of criminal proceedings by having an ex parte conversation with a juror. *Rushen* v. *Spain*, 464 U.S. 114, 104 S. Ct. 453, 76 L. Ed. 2d 267 (1983). In a per curiam decision, the court held that this violation of the defendant's constitutional rights did not automatically require a new trial but was subject to harmless error analysis. Id., 118 & n.2;[11] see

---

[9] We note that the defendant did not raise a claim of structural error until his reply brief in this court. As a result, the state did not have an opportunity to address in writing the case law on which the defendant belatedly relies. As in the past, we deplore such unhelpful briefing by the defendant. See *Grimm* v. *Grimm*, 276 Conn. 377, 393 n.19, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006).

[10] The defendant does not claim that our state constitution affords him a right to presence at his trial that is greater than the rights afforded to him under the federal constitution.

[11] *Rushen* cites *Snyder* v. *Massachusetts*, 291 U.S. 97, 54 S. Ct. 330, 78 L. Ed. 674 (1934), in which Justice Benjamin Cardozo eloquently deplored rigid application of federal law to state criminal proceedings. "The Fourteenth Amendment has not said in so many words that [the defendant] must be present every second or minute or even every hour of the trial. If words so inflexible are to be taken as implied, it is only because they are put there by a court, and not because they are there already, in advance of the decision. Due process of law requires the proceedings shall be fair, but fairness is a relative, not an absolute concept. It is fairness with reference to particular conditions or particular results." Id. 116.

also *Luu* v. *Colorado*, 841 P.2d 271, 275 (Colo. 1992); *State* v. *Fletcher*, 252 Ga. 498, 501, 314 S.E.2d 888 (1984); *State* v. *Crabtree*, 198 W. Va. 620, 629, 482 S.E.2d 605 (1996); contra, *Kansas* v. *Calderson*, 270 Kan. 241, 253, 13 P.3d 871 (2000).

The state maintains that, under the circumstances of this case, the trial court's failure to advise the defendant of his conditional right to return to the courtroom was harmless error. We agree.

A criminal defendant's constitutional right to be present at all critical stages in a criminal proceeding has long been recognized. See, e.g., *Lewis* v. *United States*, 146 U.S. 370, 373, 13 S. Ct. 136, 36 L. Ed. 1011 (1892) and, more recently, *Illinois* v. *Allen*, supra, 397 U.S. 338, 346. This constitutional right serves three important purposes. One purpose is protection of the defendant's sixth amendment right to confront the witnesses against him. "[A] defendant's literal right to confront the witnesses at the time of trial . . . forms the core of the values furthered by the Confrontation Clause. *California* v. *Green*, 399 U.S. 149, 157, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970) . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Jarzbek*, 204 Conn. 683, 692, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988). A second purpose is protection of the defendant's fifth amendment due process right to participate in the proceedings against him. Implicit in this right is the defendant's entitlement to the opportunity to provide evidence for rebuttal of adverse testimony presented by the witnesses against him. See *State* v. *Allen*, 193 W. Va. 172, 455 S.E.2d 541 (1994). A third purpose is avoidance of the risk that the jury might draw an adverse inference from the defendant's absence. See *State* v. *Crabtree*, supra, 198 W. Va. 629.

In this case, the circumstances of the defendant's exclusion from his trial implicate only his generic fifth

amendment right to participate in the proceedings. Because he was in the courtroom during jury selection, during presentation of the evidence against him, during the initial closing argument of the prosecutor and during his own counsel's closing argument, his sixth amendment confrontation rights were never in jeopardy. After his disruptive outburst caused his removal from the courtroom, when he was placed in the holding area of the courthouse, his fifth amendment rights were respected by affording him the opportunity, through a closed circuit hookup, to hear the remainder of the trial, consisting of the prosecutor's closing argument and the court's charge to the jury.[12] Finally, as we already have held, the court adequately instructed the jury not to consider his removal in adjudicating the merits of the state's case against him.

In light of this record, we conclude that the state has established, beyond a reasonable doubt, that the trial court's failure to inform the defendant of his right to reclaim his right of presence in the courtroom was harmless error. It is in the nature of many claims of constitutional error that no one asked the trial court to give the advice the absence of which the defendant now strongly criticizes. On appeal, it is our duty, however, to exercise reasonable judgment to decide whether, under the particular conditions of this case, as Justice Benjamin Cardozo put it,[13] the failure to give this advice violated the constitutional requirements of fundamental fairness that are guaranteed by the fourteenth amendment. In our judgment, a new trial on this ground is not warranted.

---

[12] We decline to consider the merits of the defendant's claim, raised for the first time in his reply brief, that the radio hookup functioned imperfectly. See *Grimm* v. *Grimm*, 276 Conn. 377, 393 n.19, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006).

[13] See footnote 11.

## II

## EVIDENCE OF STATE OF MIND

The defendant's second constitutional claim is that the court improperly deprived him of his right to present a defense and to confront and cross-examine the witnesses against him by excluding evidence to negate his specific intent to commit the crimes of which he was convicted. Because, at trial, he did not challenge the propriety of any of the four rulings on the grounds on which he now relies, he again seeks appellate review under *State* v. *Golding*, supra, 213 Conn. 233.

The evidentiary rulings with which the defendant takes issue in his appeal fall into two categories. He claims that the court improperly (1) granted the state's motion in limine barring his presentation of evidence with respect to his treatment for mental illness and (2) precluded his cross-examination of Kopaz with respect to his mental state. We are not persuaded that the court's rulings entitle the defendant to appellate relief.

## A

The state's motion in limine was granted in the following procedural setting. Anticipating that the defendant would raise questions about his intent to injure Kopaz, and noting that the defendant had not disclosed the names of any physicians who might be qualified to testify about whether he suffered from mental disease, defect or extreme emotional disturbance, the state filed a motion to bar the defendant from presenting any evidence that would have been subject to the notice requirement of Practice Book § 40-17.[14] At trial, however, the state limited the scope of its motion. It

[14] Practice Book § 40-17 provides in relevant part: "If a defendant intends to rely upon the affirmative defense of mental disease or defect or of extreme emotional disturbance at the time of the alleged crime, the defendant shall, not later than forty-five days after the first pretrial conference in the court where the case will be tried or at such later time as the judicial authority may direct, notify the prosecuting authority in writing of such intention and file a copy of such notice with the clerk. If there is a failure to comply

described its motion as seeking only to preclude the defendant from presenting mental health evidence to the jury prior to making an offer of proof. The defendant expressly acquiesced in this procedure.[15] The court then granted the state's motion.

Even under *Golding*, a defendant may not, on appeal, challenge the validity of a trial court ruling in which he expressly acquiesced. "Connecticut courts have consistently held that when a party fails to raise in the trial court the constitutional claim presented on appeal and affirmatively acquiesces to the trial court's order, that party waives any such claim." (Internal quotation marks omitted.) *State* v. *Felder*, 95 Conn. App. 248, 255, 897 A.2d 614, cert. denied, 279 Conn. 905, 901 A.2d 1226 (2006); *State* v. *Tyson*, 86 Conn. App. 607, 613, 862 A.2d 363 (2004), cert. denied, 273 Conn. 927, 873 A.2d 1000 (2005). We decline, therefore, to review the merits of court's ruling on the motion in limine.

B

The defendant's alternate evidentiary claim is that the court deprived him of his constitutional right to present a defense by improperly limiting his cross-examination of Kopaz. Conceding that he could not pursue a claim of mental illness,[16] he maintains that he had a right to introduce evidence with respect to his specific intent to commit the crimes charged. He claims

with the requirements of this rule, such affirmative defenses may not be raised. . . ."

[15] Defense counsel stated: "I have no problem, Your Honor, if—it seems appropriate that I—it's unlikely, but if it seems appropriate in the course of cross that I think it's necessary to ask the witness any questions on either of those topics, to ask to have the jury sent out." The court then granted the state's motion.

[16] At trial, defense counsel expressly told the court: "I am not offering a mental disease or defect defense. . . . I couldn't if I wanted to. Number one, there is no basis for it. Number two, there hasn't been a notice given of it . . . ."

that, on three specific occasions during the cross-examination, the court's rulings, in effect, interfered with his right to pursue this defense. We are not persuaded that the court violated his constitutional rights.[17]

Our Supreme Court has articulated the legal principles that govern our analysis of the defendant's claims. "The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . .

"A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . Thus, our law is clear that a defendant may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated. . . .

"Finally, [i]t is well established that a trial court has broad discretion in ruling on evidentiary matters, including matters related to relevancy. . . . Accordingly, the trial court's ruling is entitled to every reasonable presumption in its favor . . . and we will disturb the ruling only if the defendant can demonstrate a clear

---

[17] Although the defendant cites relevant provisions of our state constitution, he has not briefed their applicability under the circumstances of this case. We decline, therefore, to consider his state constitutional law contentions. See *State* v. *Higgins*, 265 Conn. 35, 39 n.9, 826 A.2d 1126 (2003) (noting that, when defendant does not brief claims under Connecticut constitution separately, we limit our review to United States constitution).

abuse of the court's discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Sandoval,* 263 Conn. 524, 541–43, 821 A.2d 247 (2003).

The first evidentiary ruling that the defendant challenges concerns the admissibility of an affidavit accompanying Kopaz' August 6, 2002 application for a temporary restraining order. In this affidavit, she stated that the defendant has "bipolar syndrome disease" and that "he gets violent, and he has not been taking his lithium medication . . . ." In her testimony on direct examination, Kopaz had described obtaining the restraining order, but she had not testified about the contents of her affidavit or about the defendant's mental state. The state objected to the admission of the affidavit without redaction of the references to bipolar disease and lithium medication. The state also questioned Kopaz' qualification to express an opinion on the defendant's mental health. After the court indicated its agreement with the state's objection, the defendant elected to withdraw his offer rather than to have the affidavit redacted, although he indicated that he would have acquiesced in a limiting instruction. He never articulated his present claim that the affidavit was admissible as evidence of his lack of criminal intent.

We agree with the state that the court's ruling did not violate the defendant's constitutional rights. The defendant has not explained how his constitutional right to present a defense gives him the right to question a witness on a subject about which she was unqualified to testify. See *Raudat* v. *Leary,* 88 Conn. App. 44, 50–51, 868 A.2d 120 (2005). On that ground alone, the court's ruling must be sustained. See *State* v. *Sandoval,* supra, 263 Conn. 541–43.

The second evidentiary ruling that the defendant challenges relates to his attempt to cross-examine Kopaz about an action that she allegedly had filed against

Danbury Hospital to recover damages for negligence in the hospital's psychiatric care of the defendant. The defendant offered this evidence as a prior inconsistent statement that was alleged to be admissible to impeach Kopaz' credibility on the theory that the lawsuit attributed Kopaz' injuries to the negligence of the psychiatrists, not the intentional act of the defendant. Asked by the court to identify the nature of the inconsistency, defense counsel responded that Kopaz had "in fact, alleged, at least implicitly, that [the defendant] did act with the intent to cause her injury." In his appeal brief, the defendant amplifies this claim by noting that Kopaz testified, on direct examination, that the defendant had pushed through the door at the Visconti residence while holding a gun, had ordered her to come with him and, when she had refused, had shot her. We agree with the state that a description of the defendant's conduct is not the functional equivalent of a statement about the defendant's mental state. As the state further notes, Kopaz would not have been a competent witness for testimony relating to the defendant's intent. See *State* v. *Delgado*, 178 Conn. 448, 449, 423 A.2d 106 (1979). The court's ruling was therefore proper. See *State* v. *Sandoval*, supra, 263 Conn. 541–43.

The third evidentiary ruling to which the defendant assigns constitutional significance is his inability to cross-examine Kopaz on a stipulation, in the parties' divorce agreement, in which she allegedly released him "from liability for any claims not related to the dissolution of their marriage." The trial court sustained the state's objection that the defendant was "quoting [from] a document, not in evidence, which is irrelevant . . . ." The defendant did not attempt to make the dissolution agreement an exhibit, nor did he inform the court that the stipulation was relevant to his intent to commit the crimes charged. Even now, the defendant does not fill in these gaps except by reiterating the questions asked

at trial. We agree with the state that this claim was briefed inadequately. We therefore decline to review it. See *State* v. *Vicente*, 62 Conn. App. 625, 632, 772 A.2d 643 (2001).

In sum, we conclude that the trial court's evidentiary rulings did not deprive the defendant of his constitutional right to present a defense based on his alleged lack of a specific intent to commit the crimes charged. In each instance, in light of the arguments and the record before the court, the court's rulings represented a proper exercise of its evidentiary discretion.

## III

## RIGHT OF ALLOCUTION

Practice Book § 43-10 (3) provides a right of allocution for defendants in criminal proceedings. Prior to imposing a sentence, the court must "allow the defendant a reasonable opportunity to make a personal statement in his or her own behalf and to present any information in mitigation of the sentence." Practice Book § 43-10 (3). In his third argument for reversal of his conviction, the defendant maintains that the trial court unreasonably restricted his right of allocution by limiting the scope of his remarks and by refusing to allow him to address Kopaz personally. We disagree.

The right of allocution that today is codified in the Practice Book "has its origins in the ancient common-law practice of inquiring of every defendant if he had anything to say before sentence was imposed. The practice is so old that its precise origins are unknown, but, as early as 1689, it had become apparent that the practice was more than a mere formality; in fact, the right of allocution was considered important enough at that time to require reversal when the court failed to make the inquiry of a defendant. See *Anonymous*, 3 Mod. 265, 87 Eng. Rep. 175 (1689). Historically, the practice

marked a critical juncture in criminal proceedings, as it afforded defendants the opportunity to inform the court as to the applicability of any of numerous recognized exemptions from the otherwise severe punishments imposed by the common law of the period. . . . The idea of permitting defendants an opportunity to request mitigated punishment was present in Connecticut's early jurisprudence. Chief Judge Zephaniah Swift described the practice as follows: The judge then demands of the prisoner if he has any thing to say . . . . This is rather [a] matter of form, as all the legal means of defence have been previously exhausted: but the court will permit the prisoner to make any respectful remarks respecting his case in mitigation of his conduct . . . . 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) p. 417. . . .

"Modern day justifications for preserving the practice focus on tailoring punishment to individual circumstances, providing an avenue through which a defendant may ask for mercy based on factors that might not otherwise be brought to the court's attention, and promoting safety, certainty and equity in sentencing and the judicial process overall." (Citations omitted; internal quotation marks omitted.) *State* v. *Strickland*, 243 Conn. 339, 343–45, 703 A.2d 109 (1997).

The defendant does not claim that the court lacked the authority to impose reasonable limitations on the duration and content of his right of allocution. See *State* v. *Colon*, 272 Conn. 106, 407, 864 A.2d 666 (2004) (*Katz, J.*, dissenting), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). He concedes that our standard of review is abuse of discretion. He nonetheless maintains that he was unfairly precluded from exercising a reasonable opportunity to make a statement in mitigation of his culpability. We are not persuaded.[18]

---

[18] Although the defendant did not claim at trial that the court had impaired his right of allocution, the state has not argued that his appellate claim of error is unreviewable. We will therefore assume that the defendant's claim is subject to plain error review and will address its merits.

The court permitted the defendant to describe, in some detail, the circumstances that led to his criminal conduct. He spoke at length about the nature and the origin of the deterioration in his relationship with Kopaz, which he attributed to her unsympathetic response to his loss of his employment. He expressed his dissatisfaction with the terms of the dissolution settlement that was negotiated during his incarceration pending trial. He attempted to minimize the seriousness of his conduct, which he characterized as an unintended accident that was not life threatening. He denied having had any intent to cause serious harm to Kopaz and expressed remorse for having caused her to suffer but also opined that she was overreacting to the shooting.

The issues that the court precluded the defendant from addressing related to events that had no connection with the matters adjudicated at trial. The court stopped the defendant from criticizing the terms of his dissolution agreement, the conditions of his incarceration or the destruction of his personal property during his absence from his home. Furthermore, the court refused his request to address Kopaz directly.

We note, finally, that when the court asked the defendant to conclude his remarks, the defendant replied, "Fine. All right." His trial attorney was afforded an opportunity to comment but did not do so.

Looking at this record in its entirety, we are persuaded that the court did not abuse its discretion in limiting the defendant's allocution. The court's interjections were appropriate, specific and limited. An allocution is an address to the court and not to the victim. Neither the defendant nor his attorney indicated, at trial, that the defendant's presentation had been ended prematurely. Accordingly, we reject the defendant's appellate claim that he was denied a reasonable opportunity to make a statement in mitigation of sentence.

## IV

## RESTRAINING ORDER

The defendant's fourth and final claim is that the court exceeded its statutory authority by issuing a restraining order for the protection of Diane Visconti and Edward Visconti. Because of the nature of the crimes of which the defendant was convicted, General Statutes § 53a-40e[19] concededly authorized the court to issue a standing criminal restraining order for the protection of Kopaz. The defendant argues, however, that the statute did not authorize such protection for Kopaz' sister and her former husband.

Although the defendant did not object to the issuance of the restraining order at trial, the state does not dispute that the defendant's claim of statutory misconstruction is reviewable to determine whether the court's

[19] General Statutes § 53a-40e provides in relevant part: "(a) If any person is convicted of a violation of section 53a-59 . . . or of attempt or conspiracy to violate any of said sections or section 53a-54a, against a family or household member as defined in subdivision (2) of section 46b-38a, the court may, in addition to imposing the sentence authorized for the crime under section 53a-35a, if the court is of the opinion that the history and character and the nature and circumstances of the criminal conduct of such offender indicate that a standing criminal restraining order will best serve the interest of the victim and the public, issue a standing criminal restraining order which shall remain in effect until modified or revoked by the court for good cause shown.

"(b) Such standing criminal restraining order may include but is not limited to enjoining the offender from (1) imposing any restraint upon the person or liberty of the victim; (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking the victim; or (3) entering the family dwelling or the dwelling of the victim.

"(c) Every standing criminal restraining order of the court made in accordance with this section shall contain the following language: 'This order shall remain in effect until modified or revoked by the court for good cause shown. In accordance with section 53a-223a, violation of a standing criminal restraining order issued by the court pursuant to subsection (a) of this section shall be punishable by a term of imprisonment of not less than one year nor more than five years, a fine of not more than five thousand dollars or both.' "

construction of the statute was plain error. See *State v. Preyer*, 198 Conn. 190, 199, 502 A.2d 858 (1985).

Well established tenets of statutory construction govern our consideration of the defendant's claim. "Statutory construction is a question of law and, therefore, our review is plenary. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . .

"Several additional tenets of statutory construction guide our interpretation of a penal statute. . . . [C]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . [U]nless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state." (Citations omitted; internal quotation marks omitted.) *State* v. *Velasco*, 253 Conn. 210, 219–20, 751 A.2d 800 (2000); see also General Statutes § 1-2z.

The defendant maintains that § 53a-40e does not authorize the issuance of a restraining order for the protection of Kopaz' sister, Diane Visconti, and her former husband, Edward Visconti, because subsection (a) limits the scope of the statute to "victim[s]" of one of specified offenses who are "family or household member[s] . . . ." At the least, he argues that Edward Visconti does not qualify as "family." More broadly, he argues that neither of the Viscontis was a member of

his household because his marriage to Kopaz had been dissolved by the time of his trial.

We agree with the state that the defendant reads the statute too narrowly. In subsection (a), the statute authorizes a restraining order to serve "the interest of the victim and *the public* . . . ." (Emphasis added.) General Statutes § 53a-40e (a). In subsection (b), the restraining order *"may include but is not limited to* enjoining the offender from (1) imposing any restraint upon . . . the victim; (2) threatening . . . the victim; or (3) entering the family dwelling or the *dwelling of the victim."* (Emphasis added.) General Statutes § 53a-40e (b). Uncontested evidence at trial established the fact that Kopaz had made the Visconti home her dwelling before she was shot there by the defendant.

As this court has noted, § 53a-40e does not give the court unlimited authority to issue postconviction restraining orders. *State* v. *Punsalan*, 81 Conn. App. 84, 91, 838 A.2d 232, cert. denied, 268 Conn. 905, 845 A.2d 408 (2004). The principles of strict construction that govern the interpretation of criminal statutes counsel against overreaching in application of the power that the statute confers on the court.

As we also held in *Punsalan*, however, some cases clearly fall within the statute. This is one of them. It was not plain error for the court to issue a standing restraining order pursuant to § 53a-40e for the protection of Kopaz and the members of the household in which she was residing when she was assaulted by the defendant. If, at some future time, the defendant can demonstrate that the restraining order should be modified, subsection (c) of the statute expressly permits him to seek such relief.

By way of summary, we conclude that the defendant has not established that the court violated his constitutional right of presence in the courtroom or his constitutional right to present to the jury evidence of his claim

that he lacked the specific intent to commit the crimes with which he was charged. We further conclude that the defendant has not established that the court committed plain error in imposing some limitations on his right of allocution or in determining the terms of a standing criminal restraining order following his conviction.

The judgment is affirmed.

In this opinion the other judges concurred.